CHARLIE DAUGHTRIDGE v. THE ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 11 March, 1914.)

1. Railroads—Sick Benefit Departments—False Representations—Frauds—Trials—Burden of Proof.

In an action to recover the sick benefits alleged to have been due the plaintiff by reason of his membership in the relief department of a railroad company, defendant resisted recovery upon the ground that the plaintiff, in his application for membership, had made a material and false representation in answer to a question asking if he had had a certain venereal disease, which had resulted in the acceptance by it of the application. It appeared from the application that these questions were prefaced by certificate of the applicant, in effect, that his habits were temperate, "so far as I am aware"; that he had no disease except as is shown in the "accompanying statement," etc., and to avoid the contract it is *Held,* that the defendant must show that the representations were knowingly false or made with a fraudulent purpose to mislead the defendant. Revisal, sec. 4808, has no application to this case.

2. Railroads—Sick Benefit Departments—Fraud—Trials—Evidence Sufficient—Questions for Jury.

Where resistance to recovery is made by a defendant railroad company in a suit by an employee, a member of its relief department, for sick benefits, on the ground of false and material representations made in his application for membership, and it is required that the intent to misrepresent is necessary to defeat recovery, evidence is held sufficient upon the question of defendant's liability which tended to show that the plaintiff had been required by the company to join this department, was examined and passed by the defendant's physician at the time when the disease, alleged to have been misrepresented, should have been ex-

istent and observable; that the company had for a number of months deducted the membership dues from the plaintiff's pay, and where the plaintiff denies ever having had the disease, and there is evidence tending to show that his sickness resulted from being overworked in the defendant's service.

APPEAL by defendant from *Connor, J.,* at October Term, 1913, of EDGECOMBE.

Civil action heard on appeal from justice's court.

Plaintiff sued to recover the sum of $182 for sick benefits alleged to be due him by reason of his membership in the relief department of defendant company, and offered evidence tending to show that such an amount was due, provided that plaintiff was a rightful claimant under his contract of membership.

Defendant resisted recovery on the alleged ground that the plaintiff had made false and material representations in his application for membership and by reason of which his claim was invalid, the statements being in reference to his having syphilis at the time of application made.

On the issue, plaintiff, a witness in his own behalf, testified as follows: "I worked for the Atlantic Coast Line Railroad Company about seven years ago; again in 1911—in boiler shop as helper to boilermaker, putting in and taking out grates. These grates I had to handle; they weighed about 200 pounds. Had to take out and set in fire-box of engines when hot, etc.; had been working six months before I was paralyzed; had been putting patch on dome; had worked two nights and two days successively; said work had to be done; this dome had to be completed. Foreman required me to continue this work continuously for two days and two nights, only taking time to eat day before I was paralyzed, which caused my sickness. I went home and slept day and night and went back to work. I worked that day and next day. When I went home I fell down paralyzed, February before last, and have been sick and housed up since then. Have not been able to work since then, and have been so I could not walk. When I went to work last time I went to see Mr. Williams, who told me to go to see Mr. Painter. He told me I had to join the relief department. Doctor examined

me and wrote it on paper and sent it to the shop. I joined the relief department about 1 September, 1911, and joined first class. I paid 75 cents a month, and was to get 50 cents a day for fifty-two weeks. They have refused to pay me anything."

Cross-examination: "I wrote my name in two places on paper. They refused to pay me my benefits because they said when I joined the department I had syphilis. I denied it. I have known Dr. Burnett two years, and had been my doctor when I had the stroke. I had never had gonorrhœa. I went to railroad hospital. I did not then have running gonorrhœa. Dr. McCall attended me. I went to the hospital after the stroke, and have had no medical treatment since I left the hospital. I am now 30 years old, and had never been sick before the stroke. I never had syphilis in my life. I had never received the relief department benefits, and went to the hospital right after the stroke."

Redirect examination: "Dr. Burnett came to see me twice. Four or five days after, I went to the hospital and stayed one day. I saw Dr. McCall there. I was examined about six months before I went with the defendant the last time by railroad doctor to find out if I could join relief department. From that time I continued to work. I worked two days and nights without stopping except to eat."

Dr. McCall, a witness for defendant, testified: "I had charge of the hospital at South Rocky Mount. I know the plaintiff and saw and examined him. He had paralysis in right leg, arm, face, and tongue, right side, and was carried into the hospital by two men. I made examination of him physically, and he was almost completely paralyzed. There was a small scar on the genital organ of the plaintiff. He said it was not sore; his legs were also in bad shape. I gave him treatment for syphilis. He came back and showed some improvement. He had enlarged glands in his neck, which were symptoms of syphilis. In my opinion, the plaintiff's paralysis was the result of syphilis, and my opinion that plaintiff had syphilis is caused by the scar on his genital organ referred to, the enlarged glands, and the gen-

DAUGHTRIDGE v. R. R.

eral condition followed by the paralysis, and that these symptoms indicated the existence of syphilis at the time he joined the relief department.

"Hemorrhagic paralysis almost always follows a strain on the part of the patient. Syphilis is one of its prime causes. So is excessive intoxication, heavy eating, septic poison. Also happens most frequently in old age. In my opinion, plaintiff's paralysis is embolic. This happens most frequently between the ages of 20 and 30. In embolys syphilis is put down as one of the prime causes. In my opinion, embolic paralysis may be due to syphilis. It may also be due to a great many other causes."

The record states that two other doctors gave substantially similar testimony.

Dr. Bass, for plaintiff, testified: "That if the jury should find plaintiff was 28 years of age, was sitting quietly in his chair by the fire at the time he was stricken by paralysis, that he had been up to that time apparently healthy, that in his, judgment the cause of his paralysis was embolys; that this was not often caused by syphilis, but was more frequently caused by other things."

The following question was propounded to Dr. Bass by defendant on cross-examination, towit: "If the jury find the facts to be that plaintiff, about the time of the stroke of the paralysis, had enlargement of the post-cervical glands and of the glands of the groin, suffering with gonorrhœa, and had a scar on the head of his genital organ, then what, in your best opinion, nothing else appearing, was the primary cause of the paralysis?" The answer was: "I would suspect syphilis, but would not know it."

Defendant also introduced the application and contract of membership, made by plaintiff, containing, among others, the following statements, more directly relevant: "I certify that I am correct and temperate in my habits; that, so far as I am aware, I am now in good health, and have no injury or disease, constitutional or otherwise, except as shown on the accompanying statement made by me to the medical examiner, which state-

DAUGHTRIDGE *v.* R. R.

ment shall constitute a part of this application." And, in the application, after certain preliminary statements as to plaintiff and relations, there appears answer as to certain diseases, in groups as follows:

"Have you ever had any of the following:

| Pneumonia? .............. | | Syphilis? .............. | |
|---|---|---|---|
| Pleurisy? .............. | None. | Stricture? .............. | None. |
| Asthma? ............... | | Urinary Trouble?........ | |
| Bronchitis? .............. | | Appendicitis? ........... | |
| Spitting of Blood?........ | None. | Chronic Dyspepsia?...... | None. |
| Hay Fever?.............. | | Dysentery? .............. | |
| Fits? .................... | | Hemorrhoids (Piles)?..... | |
| Dizzy or Fainting Spells?.. | None. | Rupture? .............. | None. |
| Sunstroke? .............. | | Rheumatism? ........... | |

Among other things, the court charged the jury as follows:

1st. If you shall find from the evidence that the plaintiff did have syphilis at the time of joining the relief department, and you shall further find from the evidence that the plaintiff knew he had syphilis or had reasonable grounds to believe that he had it, but falsely represented to the defendant he did not have syphilis, and thereby misled the defendant so as to induce the defendant to receive him as a member of the relief department, when it would otherwise not have received him as a member of the relief department, then you will answer the first issue 'No'; but if the defendant has failed to so satisfy you, you will answer the first issue 'Yes.' "

2d. "If you find that the plaintiff did have syphilis at the time of joining the relief department—and the burden is on the defendant to prove to you that he did have it—and you find from the facts that he did have it, then the defendant must also prove to you, as above stated, that the plaintiff knew, at the time he made the statement, that he had the syphilis, and that he made the statement that he did not have it to deceive and fraudulently mislead the defendant so that the defendant would receive him as a member. If the defendant fails to so prove and satisfy you, you will answer the issue 'Yes.' "

Defendant excepted. Verdict and judgment for plaintiff, and defendant excepted and appealed.

*R. T. Fountain and G. M. T. Fountain & Son for plaintiff.*
*F. S. Spruill for defendant.*

HOKE, J. In reference to regular contracts of insurance, section 4808 of Revisal makes provision as follows: "All statements or descriptions in any application for a policy of insurance, or in the policy itself, shall be deemed and held representations and not warranties; nor shall any representation, unless material or fraudulent, prevent a recovery on the policy."

This section is no more than a succinct statement of the law which ordinarily obtains in the interpretation of contracts, and, construing the same in *Fishblate v. Fidelity Co.,* 140 N. C., 589, it was held, among other things, that "Every fact untruly asserted or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally influence the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of premiums." This principle was approved and again applied in *Bryant v. Insurance Co.,* 147 N. C., 181, and in several well considered cases since that time, notably in *Alexander v. Insurance Co.,* 150 N. C., 536, and *Gardner v. Insurance Co.,* 163 N. C., 367; 79 S. E., 809.

In *Alexander's case, Associate Justice Brown,* delivering the opinion, said: "The company was imposed upon, whether fraudulently or not is immaterial, by such representations, and induced to enter into the contract. In such case it has been said by our highest Court that: 'Assuming that both parties acted in good faith, justice would require that the contract be canceled and the premiums returned,'" citing *Insurance Co. v. Fletcher,* 117 U. S., p. 519; and the same view is presented and well sustained in the recent case of *Gardner v. Insurance Co.,* opinion by *Associate Justice Walker.* While, therefore, it is the fully established position as to ordinary contracts of insurance, coming within the statutory provision, there are so many conditions distinguishing this from such a contract, that we

165—13

think his Honor was clearly correct in his view that the contract of membership in the relief department is unaffected by the statute, and in charging the jury, as he did in effect, that in order to sever the plaintiff's membership and deprive him of its benefits it was necessary to show that the vitiating statements were knowingly false or made with a fraudulent purpose to mislead the defendant.

From a perusal of plaintiff's evidence, uncontradicted in these respects, so far as the record shows, it appears that plaintiff was required by the company to join the relief department; that he was examined by the physician of the company, who himself seems to have written out the answers in the application; that every mark or indication of syphilis, now relied upon by defendant to defeat recovery, was existent and observable at the time of examination made, and, further, that for the six months that plaintiff was employed and until he was paralyzed, after 48 hours of continuous and very heavy work, "taking only time to eat," there had been deducted from his payroll 75 cents, the monthly charge for membership, and that there is no offer to return any part of this amount. While these considerations might not, of themselves, avail to change the terms of a contract otherwise plain of meaning, they, or some of them, are relevant where interpretation is permitted, and were no doubt given consideration by the company in framing their printed form of application for membership. For it will be observed that, in this form signed by the plaintiff, the representations are not positive in terms as in usual and voluntary applications for insurance, but, as heretofore noted from the evidence, they are prefaced and affected by the statement: "I certify that I am correct and temperate in my habits; that, *so far* as I *am aware,* I am now in good health and have no injury or disease, constitutional or otherwise, except as shown in the accompanying statement made by me to the medical examiner, which statement shall constitute a part of this application." From the language of the stipulation, with the relevant facts and circumstances attending its execution, we concur, as stated, with the court below in holding good faith on the part of the applicant

is all that the company have required or should reasonably require, and that the cause in this respect has been properly submitted to the jury.

There is no error, and the judgment in plaintiff's favor is affirmed.

No error.

WALKER, J., dissenting: If the case had been submitted to the jury under the first instruction given by the court, and the same verdict had followed as is now found in the record, there would have been no error in the charge; but in the second instruction an affirmative verdict was made to turn upon whether plaintiff had made the false statement as to his health and physical condition with the actual intent to deceive and defraud the defendant. We think this is contrary to the elementary law and to the former decisions of this Court. *Fishblate v. Fidelity Co.*, 140 N. C., 589; *Bryant v. Insurance Co.*, 147 N. C., 181; *Alexander v. Insurance Co.*, 150 N. C., 536; *Gardner v. Insurance Co.*, 163 N. C., 367; and also to our statute, Revisal, sec. 4808. We believe this is admitted in the majority opinion, provided those authorities and the statute apply to the particular facts of this case or to agreements of this kind; but it is held not to be an insurance contract. This, we think, is a total misapprehension of the character of this agreement. It is generally considered as relief benefit insurance, and so far and so exactly partakes, in its essential elements, of the true nature of insurance as to fall under that denomination.

29 Cyc., at p. 8, says of these orders or associations: "While these organizations are thus distinct from insurance companies, yet where they agree with their members, in consideration of the payment of dues and assessments, to indemnify them or their nominees against loss from certain causes, such as accidental personal injury, sickness or death, they conduct an insurance business, and the distinction is in so far without a difference. The certificate issued to the member stands in place of the ordinary insurance policy and is essentially a contract of insurance. Upon this view, in many States, these societies are

deemed insurance companies, and their rights and liabilities are governed accordingly, and the statutory regulations prescribed for insurance companies apply to them, in the absence of statutes regulating benevolent or friendly societies with insurance features."

It is impossible for us to conclude, after comparing this contract and one for simple insurance, that the same principles which govern in the latter as to good faith in making representations, and their materiality, should not be strictly applicable to the former.

But it is not necessary, in order to show the plain error of the charge, that we should be able to assimilate the two kinds of contracts, or assign them both to the same category in law. The doctrines which govern as to the validity and enforcement of insurance contracts are, in all important respects, applicable to contracts generally. Bigelow (Ed. 1890), p. 8, says, referring to what is necessary to constitute fraud: "But the truth is, as Lord Kenyon virtually said, and as others have pointed out, such a case is falsehood told *scienter;* for the person who makes such a statement declares by plain implication that he is possessed of knowledge of facts sufficient to justify it; and that, by the very terms of the case, he knows to be false. This for many years has been held enough. The fraud is in the means, not in the 'endeavor.'" And again at p. 117: "Though it is usual in actions for fraud to charge expressly a fraudulent intent, where the fraud is alleged to consist in intention, and the *quo animo* is the gist of the inquiry, still there is no rule requiring a fraudulent intent to be averred where the intent is a legal conclusion drawn from the facts alleged, and where the existence of those facts, and not the fraudulent intent, is the gist of the inquiry and the foundation of the rights asserted in the action." Practically the same rule is stated in 9 Cyc., pp. 409-411: "Contracts of insurance are of a special nature, within this rule, so that an innocent misrepresentation or concealment of material facts will avoid the policy. The test of fraud, as opposed to misrepresentation, is that the former does, and the latter does not, give rise to an action *ex delicto.* Therefore mere repre-

sentation, although false and material, if not knowingly false, so as to constitute fraud, will not support an action for damages, unless it is a term or condition in the contract, or the parties stand in a fiduciary relation. In contracts *uberrimae fidei* (where one party relies on the other party's knowledge of the facts), and where merely innocent misrepresentation avoids the contract, such misrepresentation may be set up as a defense to defeat an action at law on the contract. The same is true where the parties occupy a fiduciary or confidential relation. And as we have seen, an innocent misrepresentation may be ground for rescinding or reforming a contract in equity, or for refusing to compel specific performance. Fraud is a false representation of fact, made with a knowledge of its falsehood, or recklessly, without belief in its truth, with the intention that it should be acted upon by the complaining party, and actually inducing him to act upon it to his damage. It differs from mere misrepresentation in that it has the element of knowledge; and its most frequent example in the law of contracts is the making of false representations to induce consent to an agreement. It may be laid down as a general rule that any false representation of a material fact, made with knowledge of its falsity, and with intent that it shall be acted upon by another in entering into a contract, and which is so acted upon, constitutes fraud, and will entitle the party deceived thereby to avoid the contract or to maintain an action for the injury sustained."

But decidedly more to the very point is the statement of the law upon this subject to be found in 20 Cyc. (Title, Fraud), p. 37: "The proposition, that a fraudulent or dishonest intent is necessary, means nothing more than that the misrepresentation must be made with knowledge of its falsity or with what the law regards as the equivalent of such knowledge, and with the intent that it shall be acted upon or in such a manner as naturally to induce the other person to act upon it. If these circumstances exist, the misrepresentation is fraudulent both in morals and in law, and is made with all the fraudulent intent which the law requires; a motive to obtain benefit or cause injury is not an essential element. So where the representation

relates to a material fact and (1) is made with knowledge of its falsity, or (2) recklessly, without any knowledge of its truth or falsity and as a positive assertion calculated to convey the impression that the speaker knows it to be true, a fraudulent intent will always be inferred; and independent evidence to establish it is not required."

The fraud consists in this, that the applicant for admission to this relief society has made a false representation of the fact inquired about as to the state of his health, when a truthful statement was required in order that the society might determine whether to admit him to membership, and he, of necessity, knew this to be so, and yet made a statement which was knowingly false, which, as has been shown, was vitally material and which misled the company.

If, under the first instruction, these facts alone had been found, plaintiff could not recover; but the judge complicated them with an immaterial element, namely, the actual intent to deceive or defraud the defendant, and the latter, thereby, lost the verdict. The answer was material, having been made in answer to a direct question (*Bobbitt v. Insurance Co.,* 66 N. C., 70), and if false, so as to deprive the defendant of a fair opportunity to exercise its judgment upon the question whether it would admit the plaintiff to the benefits of the society, it was, in law, fraudulent and vitiated the contract, without regard to the particular dishonest intent in the mind of plaintiff at the time he gave the answer. The very situation of the parties, the nature of their negotiations, and the questions asked of the applicant, made it essential that the answers should be true, and certainly not knowingly false, whether actually intended to deceive or not. Vance on Insurance, p. 269, says: "A false representation avoids a contract of insurance when material, and wholly without reference to the statute." Commenting on that statement, in *Gardner v. Insurance Co.,* 163 N. C., at p. 374, we said: "Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or

in estimating the degree or character of the risk, or in fixing the rate of premium," citing *Fishblate v. Insurance Co., supra; Alexander v. Insurance Co., supra,* and many other authorities.

The *Alexander case* expressly holds. it to be immaterial whether the statement was intentionally fraudulent or deceitful, and it is said therein: "The company was imposed upon by such representation, and induced to enter into the contract. In such case it has been decided by the highest Court that, 'Assuming that both parties acted in good faith, justice would require that the contract be canceled and the premiums returned,'" citing *Insurance Co. v. Fletcher,* 117 U. S., 519, and *Bryant v. Insurance Co., supra.*

When plaintiff was asked for the information, he was bound to know what was expected of him, and that a false answer would mislead the defendant and induce it to make the agreement. Every man of intelligence and honesty would necessarily know the effect or consequence of a false affirmation as to the state of his health; and to charge that defendant must prove, and the jury must find, that plaintiff actually had a dishonest motive in giving the false answer, was going beyond what the law required to defeat a recovery. But for the erroneous instruction, the jury may have found the facts, as contained in the first instruction, and answered the issue "No." The same idea was involved in *Boddie v. Bond,* 154 N. C., 359, 366, where we declared substantially the same principle, as applicable to a case of equitable estoppel. We there held that when a man knowingly induces his neighbor to regard as true that which is false, he will not be allowed to take advantage of any resulting agreement, if the person to whom the misrepresentation was made was thereby misled to his injury by the asseveration or conduct of the other party, citing *Kirk v. Hamilton,* 102 U. S., 68; *Light Co. v. Bristol Gas Co.,* 99 Tenn., 371. The rule of honesty is the rule of the law, and strict compliance with it is exacted, and he who breaks it must pay the penalty if loss or injury results.

It seems to be conceded in the majority opinion that our statute, Revisal, sec. 4808, "is but a succinct statement of the

law which ordinarily obtains in the interpretation of contracts," and this being so, if a representation is knowingly false, material, and induces another to enter into a contract, relying upon the truth of the statement, the contract is not enforcible.

It can make no difference in the result that plaintiff was required to join the society as a condition of entering into the defendant's service. He had an option to enter into the service or not, and a full opportunity to exercise it. His action was, in every respect, voluntary. There is no finding that defendant knew of the plaintiff's condition at the time the contract was made. Nothing was said in the charge about it, nor was a finding in regard to it, one way or another, required by the court.

The amount involved in this case is not large pecuniarily, but the principle announced by the Court is important in its consequences, and will be followed as precedent hereafter. We respectfully think it will tend to unsettle the law upon the subject of fraud in the making of contracts. It is better to hold fast to the established principle that a false statement, which in its very nature must produce a certain impression upon another and induce him to act in accordance therewith, or, in other words, which is calculated necessarily to mislead, and which does actually mislead him into a course of action which otherwise he would have rejected, is fraudulent in law, if knowingly made, and will avoid a contract which is the result of it, without any specific intent to defraud.. The law will not permit a man to take advantage of conduct on his part which has prejudiced another. It will presume that he intended the evil consequences which have resulted, without actual proof that he did so intend, and will hold him bound by his act. It is not his particular motive that the law regards so much as the certain tendency of his conduct to mislead the one who is dealing with him.

JUSTICE BROWN concurs in the dissenting opinion.