## RIGHTS OF TWO WIVES IN THE PROPERTY OF AN ALIEN.

### Common Pleas Court of Stark County.

SONIA FALKOFF AND FRIEDA FALKOFF ET AL. V. ESTHER SUGERMAN ET AL.

### Decided December, 1925.

*Title to Property in Ohio—Not Affected by Action of a Communistic State—Whereof the Owner is a Citizen—Ecclesiastical Divorces Void in Ohio—First Wife of a Russian Alien—Awarded Dower in Property in Ohio—Deeded by the Alien to a Second Wife—Daughter of First Wife Declared Next of Kin—Failure of Plea of Estoppel Against Denial of Divorce—Section 8589.*

1. Under the constitution and laws of Ohio the courts of the state are open to any alien.

2. The right is not predicated upon a condition precedent that the alien must be a citizen of a country with which the United States has diplomatic relations.

3. Section 8589, of the General Code of Ohio, permitting aliens to "hold, possess and enjoy lands, tenements and hereditaments" is broad enough to include a claim of dower.

4. A communistic state that takes title to all property in its domain has no extra territorial powers, and a citizen of such a state may assert as an individual in the Ohio courts any rights he may have to property located in the state.

5. A Rabbinical, or other ecclesiastical, divorce is void in the states of Ohio and Missouri, hence a marriage contracted in Ohio in 1914, when one party to the same had been lawfully married in Russia in 1896, and claimed no other dissolution of the contract than a Rabbinical divorce granted by a Rabbi in St. Louis, Missouri, is void.

6. Upon the death of the party to the said Ohio contract of marriage who had formerly been married in Russia, his lawful widow is the woman he married in Russia and his next of kin is the daughter born to the latter union.

7. Divorce by estoppel, or estoppel to deny a divorce, is not a favored defense in Ohio, and before such a defense is available the representations as to a divorce having theretofore been obtained must have been made to the innocent party entering into a second marriage in such a manner as to preclude any reasonable possibility of doubt about such statements being true, and the innocent party must not only have relied upon the

truth of such representations but must have been without any opportunity to verify them.

8. The recording of a deed in the lifetime of the grantor is not a condition precedent to the passing of title, provided complete delivery was made to the grantee.

9. The fact that one occupying the relation of husband insured and rented properties in his own name that he had theretofore conveyed to his wife by deed duly executed and delivered but not recorded, will not avoid the effect of the execution and delivery of the deed where the rights of creditors are not involved.

*Amerman & Mills, Rice & Souers* and *Harry Nusbaum,* for plaintiffs.

*H. B. Webber* and *Turner, Ake, Abt & Gnau,* for defendant.

CLEVENGER, J. (Sitting by assignment).

This is an action for equitable relief, partition and assignment of dower. The plaintiff, Sonia Falkoff, alleges that on the 9th day of August, 1896, she was married to Isador Falkoff, and that the plaintiff, Frieda Falkoff is a daughter born to that union.

That said Isador Falkoff died on the 5th day of July, 1922. That in his lifetime he was seized of certain real estate; then follows a description of tracts Nos. 1 and 2, in the city of Canton, Ohio, referred to throughout the trial as the "South Market Street" and "Cleveland Avenue" properties. Said plaintiff alleges that she is the legal widow of said Isador Falkoff, otherwise referred to as Isador Falk.

It is alleged that said Isador entered into a pretended marriage with the defendant Esther Sugerman on the 9th day of April, 1914, but that said marriage was illegal because plaintiff was then the lawful wife of said decedent.

Plaintiffs further allege that on the 10th day of September, 1918, and on the 27th day of July, 1920, said decedent executed deeds to all of tract No. 2, and one-half of tract No. 1, as described, to said Esther Falk.

They allege that no delivery of said deeds was ever made, and that said Esther Falk procured the same and placed them upon record after the death of said Isador Falkoff.

They pray for the cancellation of said deeds, and that the property be decreed to be the property of the plaintiffs; or, if said deeds are found to be valid, that dower be assigned said Sonia in both of said tracts, and that partition of tract one be decreed as between said Frieda Falkoff and Esther Falk.

The defendant has filed a very voluminous answer to this petition, the salient point of which are as follows:

1.  A general denial of all averments of the petition.

2.  That the real names of the plaintiffs are Sonia Zarchin and Frieda Turovlin.

3.  That plaintiffs are citizens of Soviet Russia, and as such have no rights in the American courts, as said Russian Government is unrecognized by the American Government.

4.  That the claim of Sonia Falkoff to dower in said premises is a pretense and a fraud.

5.  Pleads at length the idea that the property of all Russian citizens belongs to the government.

6.  Defendant alleges her marriage to decedent on April 8, 1914, and that she is now his lawful widow. That if ever the said Sonia Falkoff was married to said Isador, she years ago abandoned him and refused to treat or recognize him as her husband and held herself to be free of any marital relations, and that somewhere in Russia, long prior to defendant's marriage to said Isador, said Sonia was divorced from said Isador Falk. That by her conduct she is estopped to deny that she is divorced.

Cross-Petition. By way of cross-petition defendant alleges that David Falk and Lewis Falk, brothers of said Isador Falk, deceased, sought to compel the defendant to share with them, and their brothers and sisters in Russia, the estate left by said Isador, and upon her re-

fusal so to do, conspired to put forward the plaintiffs herein as claimants to said estate, and asked that David and Lewis Falk be made parties to the action. Lengthy averments are set· forth in said cross-petition, which concludes with a prayer for ·a decree adjudging that she is the lawful owner of said premises free from any claim of plaintiffs' and for all other proper relief.

The said David and Lewis Falk filed a joint answer in which they deny all the allegations of said cross-petition. Deny that they ever claimed, or now claim, any interest in said estate.

The plaintiff, Frieda Falkoff, replied to said answer and cross-petition by alleging that her maiden name was Frieda Falkoff, but that she is now married to one Salman Turovlin, and denies all other averments of said answer and cross-petition.

These are the issues, briefly stated, upon which the cause went to trial. The matters we have to determine are the respective rights of plaintiffs under the constitution and laws of the state of Ohio.

Section 16 of Article 1 of the Ohio Constitution reflects conditions prevalent in the United States at the time it was adopted. Said section reads as follows:

"All courts shall be open, *and every person*, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law; and shall have justice administered without denial or delay."

Following the broad principle above quoted, the state has seen fit to adopt a statute fixing the character of persons who may acquire, hold and enjoy lands, etc., in this state.

Section 8589 of the General Code reads as follows:

"Section 8589. Aliens may hold, possess and enjoy lands, tenements and hereditaments within this state, either by descent, devise, gift or purchase as fully and completely as any citizen of the United States, or of this state can **do.**"

No language could be broader. This is a comparatively new country. At the time of the adoption of our federal and state constitutions there were few citizens, or residents, of this country who did not have close relatives on the other side of the ocean. From that day to the present time immigration from the old countries to this one has continued. Until quite recently we have held out a special invitation to residents of foreign countries to come and reside here. These facts would necessarily compel conditions out of which inheritances and business interests would develop. These matters were taken into account in the drafting of our constitutions and statutes, and care was exercised that no one should be excluded from our courts on account of citizenship. It would seem like folly to give aliens the right to "hold, possess and enjoy" lands, etc., in this state, and, because of their foreign citizenship, deny them access to our courts in order that such rights might be protected. It is manifest that the word "aliens," as used in Sec. 8589, is not limited to citizens of foreign countries with which the United States has treaty or diplomatic relations, but is used in its broadest sense. The question was raised that the words of our statute giving aliens the right to "hold, possess and enjoy lands, tenements, etc.," would not include dower, as the latter is but a right to use certain lands during life, but the court is of the opinion that all interests in lands were intended to be included. The right of plaintiffs to resort to the courts of this state for a redress of their grievances cannot be denied because they are citizens of a foreign country unrecognized diplomatically by the United States, nor because one of the plaintiffs asserts a claim for dower only.

The denials of the answer, as well as the opening statements of counsel for defendant, Esther Sugerman Falk, put in issue the identity of the plaintiffs. This casts the burden on the plaintiffs to establish, in the one case that Sonia Falkoff was legally married to Isador Falkoff at,

or about, the time alleged, and, on the other hand, that the plaintiff Frieda Falkoff Turovlin is a daughter born to that union.

Counsel for defendant, in their arguments, were willing to admit that the evidence of the identity of these plaintiffs thoroughly establishes that fact. Not only did Sonia testify to entering into the contract of marriage with said Isador Falkoff, but was supported by four others who were present at the wedding. In addition to this evidence the photographic copy of the public records in the city where the wedding was alleged to have occurred, made out, as it seems to the court, in strict accord with the Russian law as to the record of Jewish marriages, establishes this fact. There being no American Consular representatives in Russia, the plaintiffs secured the attestation of the British officials, both in Russia and England, as to the official character of the Russian officers who certified to the copies of the said records. In the opinion of the court, the attestation of the various British officials was unnecessary, but does not lessen the weight of such evidence. The testimony of one party to the contract, supported by four others who were present at the wedding; the proof of the Russian law on the subject, and the photographic copy of the official document showing compliance with the law, would make such a *prima facie* case as to require evidence to rebut and defeat it. But evidence of the marriage does not stop at that point. The photographs exchanged and the correspondence between the parties show conclusively that the two plaintiffs are respectively Sonia Zarchin whom Isador Falkoff married August 9, 1896, in Russia, and Frieda Falkoff, a daughter born to that union on July 6, 1898. The evidence further shows that no other cihld was ever born to the said Isador Falkoff, known in Canton as Isador Falk. Therefore, the rights of said Frieda as the only next of kin and heir at law of said Isador Falk, or Falkoff, are established. The rights of said Sonia as wife and widow are likewise established

unless the defendant has shown, by a preponderance of the evidence, that said marriage contract was, in some legal manner, dissolved in the lifetime of Isador Falkoff. Therefore the next, and perhaps the most interesting question involved in the case, is whether the evidence establishes the dissolution of said marriage contract, or, if not a dissolution, such a state of facts as that said Sonia is estopped to deny its dissolution.

Not an attempt has been made to produce a record of any dissolution of this marriage contract by any legal authority anywhere. Sonia denied that such a dissolution was ever made on her action. No one claimed that any court in America ever granted a divorce to Isador. The only evidence on the subject is the testimony of the defendant, Esther Sugerman, that prior to her said marriage with said Isador he showed her what he said was a "Get," or Rabbinical divorce, granted him by some alleged Rabbi in St. Louis, Missouri. She could not read the document, and only knew what he said about it. No Rabbi was produced to support such a claim. Proof of the Missouri law was made showing that if such a document was ever issued, it was absolutely void. So far as this court knows, no state in this union permits any ecclesiastical authority to grant divorces. It is an un-American doctrine. Rabbi Pelchrovist bears out that idea in his testimony when he said no Rabbi in this country would grant a Rabbinical divorce unless the parties had already been divorced in the civil courts, or that a condition be written into the "Get" providing that it should not become effective until a civil divorce was obtained. Therefore, the evidence on that subject thoroughly establishes that no legal divorce was ever obtained anywhere.

IS THE SAID PLAINTIFF ESTOPPED TO DENY THAT SHE HAD EVER BEEN DIVORCED?

Taking up the question of the alleged divorce, it is instructive to refer to the opening statements. Counsel

for defendant undoubtedly then thought the evidence would show that Sonia had procured the Rabbinical divorce in Russia, with the consent of Isador. Not only did Sonia deny such a thing, but Rabbi Pelchrovist, in his definition of the Jewish law, made it impossible for her to have obtained such a divorce. To students of the Hebrew law it is well known that only the husband can obtain a Rabbinical divorce. Therefore, that ground was abandoned, and the doctrine of estoppel was invoked. If that doctrine could apply, it must be as an equitable estoppel, or estoppel *in pais*. It was well stated by Judge Harlan in *Kirk* v. *Hamilton*, 102 U. S., 76, in the following language: "What I induce my neighbor to regard as true is the truth as between us, if he has been mislead by my asservation." Therefore, Sonia must have made some statements to the defendant Esther Sugerman, or intended to be conveyed to her, that would cause her, Esther, to believe that she, Sonia, had obtained a divorce from Isador in Russia, and Esther must have relied upon such statements and acted upon them in entering into the marriage relation with Isador Falk. Does this record show such a state of facts?

One side of the correspondence between Sonia and Isador is lacking, and the explanation that all her papers were destroyed in the great war is undoubtedly true. When Isador left her and the baby in 1900, she secured entrance to the Imperial University in St. Petersburg and took a four years course in dentistry, graduating in 1904. In that capacity she has supported herself and child ever since. As a graduate of said university she was subject to mobilization, in an hour's notice, into the Czar's army as a dentist. She was so mobilized without an opportunity to secure her personal effects on the breaking out of the war in 1914, and her home was close to the front, which was undoubtedly overrun as she states with the great German drive in Russia. There seems to be no doubt of the truth of her statement that all her papers were gone when she was able to return from the army, which was in 1917.

The fragmentary correspondence that we have between these people shows that Sonia was perfectly willing that Isador obtain a divorce, expressing her willingness to sign any papers he might desire to that end. There is no doubt but that she therein referred to the only kind of divorce she was acquainted with, to-wit, a Rabbinical divorce, which would require either her consent, or the service of the "Get" upon her in the manner provided by the Jewish law. In one letter she says to him "I understand you have a definite party. So let the Lord bless you with good luck as you wish yourself." "I personally am not thinking of marriage at present." In another letter she uses the phrase "we are entirely independent people." In another, "Believe me, dear Isador, that I had many opportunities of getting married, and I can even now get married, but my love for Frieda is preventing, but I am surprised that you have not married yet. Is is possible that it is out of love for me?"

These are substantially all the expressions in the letters from Sonia that would indicate that she considered each free to get married. In none of them does she mention obtaining a divorce. The utmost that could -be attached to such language is a probability that a dissolution of the marriage between them had been accomplished somewhere. She does not hint at such a thing as having obtained the divorce herself. No doubt if Isador's letters were available the matter would become clear. Evidently, from his subsequent actions, he did not consider that Sonia had procured a divorce. The very kind of divorce she undoubtedly referred to in her offer to sign a consent—a Rabbinical divorce—he claimed to have obtained. Statements that amount to an estoppel, that would deprive one of valuable legal rights, must be clear and unambiguous. One cannot act upon the statements of another, without further investigation, if those statements are uncertain as to meaning. One must do, as Edgar did in the Ohio case of *Edgar* v. *Richardson*, 33 Ohio State, 58, make specific inquiry and require the party making the statements to become clear and

definite in the meaning of them. The explanation Sonia gives seems perfectly logical. She understood Isador could obtain a divorce in America without her consent and she supposed he had so obtained one.

Another doctrine of estoppel is that the one complaining must have relied upon the truth of the statements and acted upon them to one's detriment. Is there any evidence whatever of such a thing in this case? None that the court can find. When the defendant was examined, on cross-examination, she at no time claimed that she relied upon any information that Sonia had divorced Isador, but on the contrary specifically stated that the "Get" Isador showed her was the sole ground of her belief that he had been divorced. The salient parts of the testimony on this subject are as follows:

On page 25 of the record:

Q. Now he had already told you he had a divorce? A. Yes.

Q. He told you he got it? A. He told me he was divorced.

Q. Did he tell you he procured the divorce? A. Yes.

Q. After he told you he procured the divorce, he told you he wanted this woman (referring to Sonia) to marry him and she wouldn't marry him, is that right? A. Yes.

Q. Did he tell you upon what ground he got the divorce? A. We didn't discuss it.

Q. Where did he tell you he got it? A. In St. Louis.

Again on page 26, after some inquiry as to a paper he had shown her, the following is a quotation from the record:

Q. Did you ask him to see any papers with reference to the divorce decree? A. Before I married him.

Q. And was it in response to your request that he showed you this paper? A. Yes.

Again on page 27, after several questions about the paper, the following is in the record:

Q. So that the only thing that you had from him then was his word that he had been divorced, wasn't it? A. Yes.

On page 28, after a colloquy:

A.   He said it was a Jewish divorce.

Q.   I asked her (addressing the court) why she didn't ask for English papers.   A.   It was sufficient for me if it was a Jewish divorce.

On pages 29 and 30:

Q.   What papers did he produce that he showed you? A.   Letters.

Q.   What papers?   A.   The Get, the Jewish divorce.

On page 31:

Q.   And that was the divorce, the kind of divorce you understood he had?   A.   Yes.

Q.   And that was the only kind of a divorce that you understood he had, wasn't it?   A.   Yes.

On page 33:

Q.   Now where was he supposed to have gotten this Get—where did he tell you he got it?   A.   St. Louis.

Q.   And that was, as you understood—was a divorce, a Jewish Get?   A.   Yes.

Q.   Is that what he told you it was?   A.   Yes.

Q.   And what church or what synagogue was it in? A.   I don't know.

On pages 442 and 443, when being interrogated as to Sonia's letters being read to her, the following is taken from the record:

Q.   And from those letters did you believe your husband was a divorced man?   A.   I did believe him.

Q.   And did you rely upon the statements in those letters and in this paper?   A.   I relied, yes.

Q.   That is, his interpretation of this paper?   A. Yes.

Q.   That is you relied upon that in marrying your husband?   A.   Yes.

Mr. Amerman: Which paper do you mean?

Witness: I mean this paper in Hebrew which he said was a "get," or divorce paper.

Sonia on page 599, in explaining her remarks in her letters, said quoting the interpreter, "She was under the impression that her husband could obtain a divorce with-

out her consent and when she would not hear from him for a month or two she would imagine that he was already free and she was also free to marry."

While defendant, on pages 442 and 443 of the record, says, in a very mild manner, that she relied upon Sonia's letters, she at no time says she relied upon them as establishing a divorce Sonia was supposed to have obtained, but again specifically ties up the contents of these letters with the Rabbinical divorce Isador said he obtained from a Rabbi in St. Louis. It is very probable that he read Sonia's letters, in connection with the "Get," to show that she had consented to his obtaining such a divorce. The evidence is overwhelming that in entering into their marriage both Esther and Isador were relying upon the Rabbinical divorce granted Isador in St. Louis, and nothing else.

The court does not doubt that a paper purporting to be a "Get," granted to Isador by an alleged Rabbi in St. Louis was shown to Esther Sugerman to induce her to enter into the marriage, but cannot escape the conviction that it was not a genuine "Get," and that Isador perpetrated a fraud upon her. His making solemn oath in obtaining the marriage license that he never had been married; his alleged losing of the "Get," and many other acts indicate that he knew all the time that he was not divorced, and it is probable that the "Get" was a forgery. His actions in the making of the deeds, and other things, rather indicate that he was making preparations against the day when another would likely turn up as the legal widow. In any event, this evidence falls far short of establishing any estoppel of Sonia respecting her claims as the lawful widow, and the holding of the court will be that she is the lawful widow and entitled to dower in the properties described, and an accounting of rents and profits since Isador's death.

We now enter upon the next important question involved in the case, to-wit, were the deeds in question delivered?

While the deeds were not placed upon record during

the lifetime of the decedent, yet if they were actually delivered to the grantee and the grantor lost control over them so that their record depended upon the will of the grantee, they would be valid and would convey grantor's interest in the respective properties. That the ·deeds were delivered in Mr. Whiting's office seems thoroughly established. That they ever again passed into possession of Isador Falk is not established. We might engage in speculation as to what might have happened if one of the properties insured in Isador's name, had burned but that is not evidence. There seems to be no evidence to contradict the statements of the defendant as to the possession of the deeds after they were delivered to her in Mr. Whiting's office. It is true there are several incidents tending to establish that Isador still considered them his properties, but there is none inconsistent with the manner of many married people in the handling of their property.

The evidence does not satisfy the court that the sole purpose in keeping the deeds off record was to give Isador credit. He had plenty of property in his name at all times, with the deeds on record, to give him all the credit he needed. But the purpose of keeping the deeds off record is not important if they were actually delivered. There is a great deal to excite a suspicion as to the manner in which so much property was accumulated in so short a time, but that is unimportant. The main question is whether the deeds were actually delivered and whether they were placed beyond the control of the grantor.

If Isador Falk had died in debt to the extent that these properties were required to discharge his liabilities, the court thinks a court of equity would set aside these deeds, but no such issue is presented. The plaintiffs stand in the shoes of decedent, and, if he could not recall the deeds, they cannot have them set aside. He had a perfect right to give his property to any one, barring the widow's rights, and in any manner he chose. As long as the rights of creditors do not intervene, he could give

the properties to the defendant and make any kind of arrangement about the record of the deeds, just so he *actually* parted with possession and control of them.   If we consider that the burden is on the defendant to establish these facts by clear and convincing evidence, the court thinks she has met it.   However, it is doubtful if such a rule would apply as between the grantee and one standing in the shoes of grantor.   But, in any event, the court is of the opinion that the evidence clearly establishes a legal delivery of the deeds in question, and that the legal title to the real estate so conveyed is in Esther Sugerman Falk.   An entry may be drawn carrying out these findings.

In conclusion, the court desires to express its appreciation of the help given it by all counsel.   Great ability has been shown on both sides, and the courtesy and kindness to the court is greatly appreciated.   The case is one of very great interest to the court, not only because of the unusual features connected with it, but because there are unusual people on both sides, and because of the large amount of property involved.   The court **cannot** refrain from expressing the hope that litigation between these people might cease and cordial relations established.   The one who did the wrong is dead.   The wife he left in Russia is to be congratulated on the brave fight she has made to bring up the daughter and sustain herself.   She is a woman of unusual force, of character.   The daughter, Frieda, is wholly innocent in the matter.   She has disclosed character and accomplishments that must be admired by all.   Neither she nor her mother have done anything but just what they had a. perfect right to do. The two brothers, David and Lewis, accused of entering into a conspiracy to wrongfully obtain this property, have been fully vindicated.   Not a particle of evidence of a conspiracy was shown.   Esther Sugerman Falk is the undoubted victim of the deceit of Isador Falk, deceased.   That cannot now be remedied.   He atoned in so far as he could by bestowing property upon her, but Esther still remains the high class lady she undoubtedly was before she knew Isador Falk.