KIRK *v*. HAMILTON.

1. In 1859, M. & Co., judgment creditors of A., filed their bill in the Circuit Court of the District of Columbia, against him and others, setting forth that he had, without consideration and with intent to defraud his creditors, conveyed to the other defendants his real estate in that district. It was adjudged, May 30, 1860, that certain lots of ground be sold by a trustee to pay M. & Co. and such other creditors as might come in according to the practice of the court. The trustee subsequently reported that, having sold a part of the lots and realized more than sufficient to pay M. & Co., he had discontinued the sale. His report was confirmed Nov. 28, 1862. An order of the court, Nov. 14, 1863, recites that certain other creditors of A. had filed petitions in support of their claims, and directs that he being then a non-resident, notice of the character and object of the petitions be given him by publication. Publication was made accordingly, and the defend-

ants failing to appear, the bill was taken as confessed. The case was referred to an auditor, who reported that the claims were in excess of the proceeds of the sale remaining in the hands of the trustee. His report was confirmed. Thereupon the trustee, without any order other than that entered May 30, 1860, proceeded to sell the remainder of the lots to B. for $950. The sale was confirmed, and the cause referred to an auditor to state the accounts of the trustee and report a distribution. A. appeared before the auditor and objected to the allowance of the simple-contract debts. The report of the auditor was confirmed, and the lots were conveyed by the trustee's deed bearing date Dec. 14, 1865, to B., who entered thereon, and made improvements to the value of $4,000. A., who then resided upon a lot adjoining the premises, asserted no claim to them except as to three feet for an alley, and he afterwards admitted that even in regard to that part he was mistaken. A., Dec. 21, 1872, claiming that the trustee's sale was void and passed no title, and having obtained a deed from the party to whom he had in trust previously conveyed the lots so purchased by B., brought ejectment against the latter. *Held,* that, without affirming that the sale to B. was valid in the absence of a special direction by the court to the trustee to sell after the first order had been executed, A.'s failure to object to its validity and apply to the court to set it aside, and his not asserting any title to the premises although he had knowledge that B., claiming them under a judicial sale confirmed by a court of general jurisdiction, was expending money and making improvements thereon, constituted an equitable estoppel which precludes the maintenance of the action.

2. *Dickerson* v. *Colgrove* (100 U. S. 578) cited and approved.

ERROR to the Supreme Court of the District of Columbia.

This was an action of ejectment, brought Dec. 21, 1872, by George E. Kirk against Charles O. Hamilton and Catherine Hamilton, to recover parts of lots 7 and 9 in square 437 in the city of Washington. The defendants pleaded not guilty. A verdict was returned in their favor, and, a new trial having been refused, judgment was entered on the verdict. Kirk sued out this writ.

Six bills of exceptions were taken by Kirk. The nature and scope of the questions thereby raised will be understood from a statement of the principal facts appearing in the record of a suit in equity, commenced in the year 1859 by D W. Moore & Co., in the Circuit Court for the District of Columbia, against him, Walter Lenox, Henry Naylor, Richard H. Clarke, A. Austin Smith, Hugh B. Sweeney, John Robinson, Major Garnett, John H. Goddard, Jr., Job W. Angus, Charles Stott, and William S. Martin, in order to obtain satisfaction of several unpaid judgments against him, amounting to less than

$200, previously rendered in favor of the complainants by jus-tices of the peace.

The bill alleged that the complainants did not know of any property belonging to Kirk upon which execution could be levied; that he was the owner of a large amount of real estate in Washington, which he had conveyed for the purpose of hindering, delaying, and defrauding them in the recovery of their judgment debts, to wit, lot 78 in the subdivision of square No. 465, and parts of lots 7, 9, 10, 11, and 12 in square No. 437; that by deed of August, 1853, he conveyed part of lots 7 and 9 to the defendants Lenox and Naylor, in trust to secure the Washington Building Association the sum of money therein mentioned; that by deed of March 24, 1856, he conveyed a portion of the same lots to the defendants Clarke and Smith, in trust to secure the defendant Sweeney in the payment of a promissory note for $1,600; that by deed of April 14, 1854, he had conveyed parts of lots 10 and 12 in square 437 to the defendant Robinson, in trust to secure the defendant Garnett in four promissory notes of $131.25 each; that by deed of Oct. 13, 1854, he had conveyed the west half of lot 11 in square 437 to the defendant Goddard, in trust to secure the defendant Angus in the payment of a promissory note for $500; that it was provided in the deeds that if the several debts respectively mentioned therein were not paid at maturity, then the several parcels of ground thereby conveyed should be sold, and the balance remaining after satisfying the several debts to be paid to Kirk; that Kirk had purchased of one William S. Martin lots 43, 44, 45, and 46 in square 465, and for the purpose of defrauding, hindering, and delaying his trustees had caused the latter, by deed of April 22, 1858, to convey the same to him, as trustee for his wife and children; that the several pieces of property largely exceeded in value the debts secured thereby, and that if the debts were genuine and still unpaid (which was denied), then the interest of Kirk therein was liable in equity for the payment of the judgments, after satisfying any sums due on the debts described in the conveyances.

The bill further alleged that on 22d March, 1856, Kirk, for the pretended consideration of $4,000, conveyed to the defendant Stott, his heirs and assigns, lot 78 in subdivision of square

465, and parts of lots 7, 9, 10, 11, and 12 in square 437; that the deed was purely voluntary and with the intent to defraud and delay the creditors of Kirk; and, in any event, if a consideration passed, it was upon a secret trust to reconvey to Kirk whenever the sum of $4,000 was repaid.

It also alleged that the several deeds were duly recorded, and prayed that the deed from Kirk to Stott be declared null and void as against the complainants, and that the parcels of ground mentioned in the several conveyances be sold for the payment, "first, of such sums as were shown to be due on account of debts, and next, of the amount or amounts due to complainants on their judgments, and the costs" of suit.

Special interrogatories to the several defendants were embodied in the bill.

On 21st November, 1859, summons was issued, and returned 28th November, 1859, as served on all the defendants except Garnett and Martin.

At the May Term, 1860, a decree was, for want of an appearance and answer at rules, entered *pro confesso* against all of the defendants, except Garnett and Martin. It ordered that parts of lots 7 and 9 in square 437, and lot 78 in subdivision of square 465, "be sold, or so much thereof as may be necessary, for the payment of said complainants' claim and others who may come in as creditors of the said George E. Kirk by petition, in the manner and form required by law and the practice of the court, and that Edward C. Carrington be and is hereby appointed trustee to make such sale," &c.

After advertisement, as required by the decree, the trustee sold lot 78, with improvements, for $1,480. In his report of sale he says: "Your trustee, having sold sufficient property to pay and satisfy the claims provided for in said bill and decree, discontinued the sale of the other property mentioned in said proceedings."

On 28th October, 1862, the report of sale, no exception thereto having been filed, was confirmed, and the cause referred to the auditor to state the trustee's account and make distribution of the fund realized. After satisfying the claims of Moore & Co. and costs of suit, there was left a surplus in the trustee's hands of $1,008.52.

In an order entered Nov. 14, 1863, it is recited that certain creditors of Kirk had filed petitions, seeking the payment of numerous judgments and claims against him.   Upon the ground that he was a non-resident living beyond the jurisdiction of the court, an order was made that notice of the character and object of the petitions be given him by publication, for six weeks, warning him to appear in person or by solicitor, on or before the second Monday of January, 1864, "at rules to be held in the clerk's office" of the court, otherwise the petitions and claims would be taken as confessed against him.   Due proof of publication of that order was filed Jan. 23, 1864.   On 2d February, 1864, this order was entered: "It appearing to the clerk that the defendants Geo. E. Kirk, Walter Lenox, Henry Naylor, R. H. Clarke, A. A. Smith, H. B. Sweeney, John Robinson, J. H. Goddard, Jr., Job W. Angus, and Charles Stott have failed to appear and answer in this suit, it is, this second day of February, 1864, on motion of A. Lloyd (by Fred. H. Norton), solicitor for complainants, ordered by the clerk that the bill and the matters thereof be taken for confessed against the above defendants."

By an order of the 12th of February, 1864, the cause, with the said petitions and claims, was referred to the auditor of the court, with instructions to state the trustee's account and make distribution of the balance of the fund in his hands.   A report of distribution was made showing that judgments and claims were proven in excess of the funds remaining in the trustee's hands upon the sale of lot 78.   His report of distribution was approved April 9, 1864.

Thereupon the trustee, Carrington, without any further order, and by virtue of the original decree of May 30, 1860, advertised, and on the 19th of April, 1864, sold at public auction, the demanded premises, being the parts of lots 7 and 9 described in the bill, to Charles O. Hamilton for $950.   The sale was subsequently confirmed, and by an order of Dec. 12, 1864, the cause was referred to the auditor to state the accounts of the trustee and report a distribution.   In his report the auditor says: "Pending this last reference of December, 1864, and before the case was confirmed, Kirk returned from the South, and has appeared by Mr. Laskey, his counsel, upon

this reference.    The simple-contract debts are not admitted by him, but he states that he has offsets in bar against some if not all of them."    Appended to the auditor's report there is the following paper : " The defendant Kirk does not admit the simple-contract debts, but contests the same, and requires the said claims before they be allowed by the auditor to be established by competent proof.    R. H. Laskey, atty. for deft."    The report was confirmed Feb. 5, 1865, and the purchase-money having been paid, Carrington, the trustee, by his deed of Dec. 14, 1865, conveyed the premises to Hamilton, who thereupon went into possession.    The remaining facts are stated in the opinion of the court.

*Mr. Albert Pike* and *Mr. Luther H. Pike* for the plaintiff in error.

*Mr. Richard T. Merrick* and *Mr. Martin F. Morris*, contra.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

It appears from the first bill of exceptions that, upon the trial of the cause, the plaintiff, to maintain the issue joined, gave evidence to the jury tending to prove title in himself to the land in dispute, as well as his actual possession of the premises under that title ; that he had fully discharged the indebtedness secured by the two deeds of trust executed, one to Lenox and Naylor, and the other to Clarke and Smith ; that Charles Stott, on the 14th of May, 1872, reconveyed to him all that portion of the premises which, on the 22d of March, 1856, he had conveyed to Stott ; that he had never made nor authorized any other conveyances than those just named.    He also introduced a deed from Carrington, as the supposed trustee in the case of *Moore & Co.* v. *Kirk, &c.*, at the same time, however, denying its validity, and avowing that it was introduced subject to his exceptions reserved, and to be thereafter presented, as to its sufficiency in law to prove title in the defendants or either of them.    It was admitted by the court subject to those exceptions.    The plaintiff further gave evidence to prove that defendants were in possession of the premises at the commencement of the action, and then rested.

The bill of exceptions then shows that defendants, to sustain

their defence, and to prove title out of the plaintiff, offered to read in evidence the record of the equity suit of *Moore & Co.* v. *Kirk, &c.* Plaintiff insisted that the record of that suit was insufficient in law to maintain the issue on defendants' behalf, or to show title in them, and asked the court to inform the jury that it should not then be admitted in evidence, except subject to his exceptions as to its sufficiency in law, to be thereafter presented to the court. pending the further trial of the cause. The record was so admitted. The defendants, further to maintain their defence, and to prove title in themselves, offered to introduce testimony tending to prove that, at the time of the purchase of the premises at the sale made by Carrington, trustee, in the suit of *Moore & Co.* v. *Kirk, &c.,* the only improvement thereon was a two-story four-room brick house, and that, about the year 1868, the defendants erected an extensive building on the property, at a cost of some $4,000; that when they began such building, and for some time thereafter, the plaintiff Kirk resided on the adjoining premises; that during all that time he well knew of said improvements, made no objection thereto, and asserted no claim to the property, except the west three feet thereof, adjoining his ground, and which he claimed as an alley, and, even as to such portion, he subsequently informed the witness he was mistaken; and, lastly, that the plaintiff, though residing in the city of Washington ever since about the year 1865, never, to defendants' knowledge, until the commencement of this action, asserted any claim to the premises in dispute.

At that stage of the trial the plaintiff interposed and asked the court to inform the jury that the testimony thus offered, in reference to defendants putting improvements on the premises, was inadmissible in law, and that such issue ought to be found for the plaintiff. The court ruled that the testimony was admissible, to which plaintiff excepted. The defendants then gave the said testimony in evidence to the jury, who rendered a verdict against the plaintiff upon the issue set forth by the first bill of exceptions.

The remaining bills of exceptions present, in different forms, the general question whether the sale by Carrington, as trustee, on the 19th of April, 1864, was or was not, upon the face of the

record of *Moore & Co.* v. *Kirk, &c.*, a mere nullity. Its validity is assailed by the plaintiff on various grounds, the most important of which seem to be : 1. That as Moore & Co. sued in their own behalf only, and not for the benefit of themselves and other creditors, the jurisdiction and power of the court was exhausted by the first sale (of lot No. 78), which raised an amount largely in excess of the claims for which Moore & Co. sued. 2. That the utmost which the court, upon the pleadings, could do, was to distribute such excess among the other creditors of Kirk who should appear, in proper form, and establish their claims.   3. That the court was entirely without jurisdiction to make a second order of sale, and did not assume to exercise any such power.   4. That the second sale by Carrington, having been made without any previous order or direction of the court, its confirmation, and the deed subsequently made to Hamilton, were absolutely null and void.

In the view we take of the case, it is unnecessary to pass upon these several objections. If it be assumed that the record of the suit of *Moore & Co.* v. *Kirk, &c.*, was, of itself, insufficient in law to divest Kirk of title to the premises in dispute, or to invest Hamilton with title, the question still remains, whether the facts disclosed by the first bill of exceptions do not constitute a defence to the present action.

After the confirmation of the sale of April 19, 1864, before any deed had been made, and while the cause was, upon reference for a statement, as well of the trustee's accounts as for distribution of the fund realized by the sales, Kirk, it seems, appeared before the auditor, by an attorney, and made objection to the allowance of the simple-contract debts which had been proven against him in his absence. So far as the record discloses, no other objection to the proceedings was interposed by him. Undoubtedly he then knew, he must be conclusively presumed to have known, after he appeared before the auditor, all that had taken place in that suit during his absence from the District, including the sale of the premises in dispute, which took place only a few months prior to his appearance before the auditor. If that sale was a nullity, the court, upon application by Kirk, after his appearance before the auditor, could have disregarded all that had been done subsequently to the

first sale, discharged Hamilton's bond, returned the money he
had paid, and, in addition, placed Kirk in the actual possession
of the property. . No such application was made. No such
claim was asserted. No effort was made by him to prevent the
execution of a deed to the purchaser at the second sale. So far
as the record shows, he seemed to have acquiesced in what had
been done in his absence. In 1868, three years after his return
to the city, and two years after Hamilton had secured a deed
in pursuance of his purchase, he became aware that Hamilton
was in actual possession of the premises, claiming and improv-
ing them as his property. He personally knew of Hamilton's
expenditures of money in their improvement, and remained
silent as to any claim of his own. Indeed, his assertion while
the improvements were being made, of claim to only three feet
of ground next to the adjoining lot upon which he resided, was,
in effect, a disclaimer that he had, or would assert, a claim to
the remainder of the lots 7 and 9 which Hamilton had pur-
chased at the sale in April, 1864. And his subsequent declara-
tion that he was in error in claiming even that three feet of
ground only added force to his former disclaimer of title in the
premises. . Hamilton was in possession under an apparent title
acquired, as we must assume from the record, in entire good
faith, by what he supposed to be a valid judicial sale, under the
sanction of a court of general jurisdiction.

The only serious question upon this branch of the case is
whether, consistently with the authorities, the defence is avail-
able to Hamilton in this action of ejectment to recover the
possession of the property. We are of opinion that the present
case comes within the reasons upon which rest the established
exceptions to the general rule that title to land cannot be
extinguished or transferred by acts *in pais* or by oral declara-
tions. "What I induce my neighbor to regard as true is the
truth as between us, if he has been misled by my asseveration,"
became a settled rule of property at a very early period in
courts of equity. The same principle is thus stated by Chan-
cellor Kent in *Wendell* v. *Van Rensselaer*, 1 Johns. (N. Y.) Ch.
344: "There is no principle better established, in this court,
nor one founded on more solid considerations of equity and
public utility, than that which declares, that if one man, know-

ingly. though he does it passively, by looking on, suffers another to purchase and. expend money on land, under an erroneous opinion of title, without making known his own claim, shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel." p. 354.

While this doctrine originated in courts of equity, it has been applied in cases arising in courts of law.

In *The King* v. *The Inhabitants of Butterton* (6 Durnf. & E. 554), Mr. Justice Lawrence said : " I remember a case some years ago in which Lord Mansfield would not suffer. a man to recover, even in ejectment, where he had stood by and seen the defendant build on his land."

In 2 Smith, Lead. Cas., pp. 730–740 (7th Am. ed., with notes by Hare and Wallace), the authorities are carefully examined. It is there said that there has been an increasing disposition to apply the doctrine of equitable estoppel in courts of law.

. Again (pp. 733, 734) : ". The question presented in these and other cases, which involve the operation of .equitable estoppels on real estate, is both difficult and important. . It is undoubtedly true that the title to land cannot be bound by an oral agreement, or passed by matter *in pais*, without an apparent violation of those provisions of the Statute of Frauds which require a writing when the realty is involved. But it is equally well settled that .equity will not allow the statute to be used as a means of. effecting the fraud which it was designed to. prevent, and will withdraw every case not within its. spirit from the rigor of its letter, if it be possible to do so without violating the general policy of the act, and giving rise to the uncertainty which it was meant to obviate. It is well established that an estate in land may be virtually transferred from one man to another without a writing, by a verbal sale accompanied by actual possession, or by the failure of the owner to give notice of his title to the purchaser under circumstances. where the omission operates as a fraud ; and although the title does not pass under these circumstances, a conveyance will be decreed by a court of equity. It would, therefore, seem too late to contend that the title to real estate cannot be passed by matter *in pais*, without disregarding the Statute of Frauds ; and

the only room for dispute is as to the forum in which relief must be sought. The remedy in such cases lay originally in an application to chancery, and no redress could be had [except] in a merely legal tribunal, except under rare and exceptional circumstances. But the common law has been enlarged and enriched under the principles and maxims of equity, which are constantly applied at the present day in this country, and even in England, for the relief of grantees, the protection of mortgagors, and the benefit of purchasers, by a wise adaptation of ancient forms to the more liberal spirit of modern times. The doctrine of equitable estoppel is, as its name indicates, chiefly, if not wholly, derived from courts of equity, and as these courts apply it to any species of property, there would seem no reason why its application should be restricted in courts of law. Protection against fraud is equally necessary, whatever may be the nature of the interest at stake; and there is nothing in the nature of real estate to exclude those wise and salutary principles, which are now adopted without scruple in both jurisdictions, in the case of personalty. And whatever may be the wisdom of the change, through which the law has encroached on the jurisdiction of chancery, it has now gone too far to be confined within any limits short of the whole field of jurisprudence. This view is maintained by the main current of decisions."

This question in a different form was examined in *Dickerson v. Colgrove*, 100 U. S. 578. That was an action of ejectment, and the defence, based upon equitable estoppel, was adjudged to be sufficient. We there held that the action involved both the right of possession and the right of property, and that as the facts developed showed that the plaintiff was not in equity and conscience entitled to disturb the possession of the defendants, there was no reason why the latter might not, under the circumstances disclosed, rely upon the doctrine of equitable estoppel to protect their possession.

Applying these principles to the case in hand, it is clear, upon the facts recited in the first bill of exceptions, and which the jury found to have been established, that the plaintiff is estopped from disturbing the possession of the defendants. He knew, as we have seen, that the defendants claimed the property

under a sale made in an equity suit to which he was an original party. The sale may have been a nullity, and it may be that he could have repudiated it as a valid transfer of his right of property. Instead of pursuing that course, he, with a knowledge of all the facts, appeared before the auditor and disputed the right of certain creditors to be paid out of the fund which had been raised by the sale of his property. He forbore to raise any question whatever as to the validity of the sale, and by his conduct indicated his purpose not to make any issue in reference to the proceedings in the equity suit. Knowing that the defendants' claim to the premises rested upon that sale, he remained silent while the latter expended large sums in their improvement, and, in effect, disclaimed title in himself. He was silent when good faith required him to put the purchaser on guard. He should not now be heard to say that that is not true which his conduct unmistakably declared was true and upon the faith of which others acted.

The evidence upon this point was properly admitted, and operated to defeat the action independently of the question whether the sale by Carrington, the trustee, and its confirmation by the court, was, itself, a valid, binding transfer of the title to the purchaser.

What has been said renders it unnecessary to consider the questions of law presented in the remaining bills of exceptions.

*Judgment affirmed.*