STATE OF MISSOURI upon the information of ROY MCKITTRICK, Attorney General, at the relation of the CITY OF CALIFORNIA, Relator, v. MISSOURI UTILITIES COMPANY, a Corporation.—96 S. W. (2d) 607.

Division One, September 8, 1936.

*Roy McKittrick*, Attorney General, *Covell R. Hewitt*, Assistant Attorney General, and *L. P. Embry* for relator.

388

*S. W. Fordyce, N. W. Hartman* and *Fordyce, White, Mayne & Williams* for respondent.

HAYS, J.—This is an information in the nature of *quo warranto,* filed by the Attorney General at the relation of the city of California, by which it is sought to oust the respondent from the use of the streets, alleys, and public places of said city for the maintenance of its electric light and power lines and equipment. The return sets up defenses of equitable estoppel, lack of jurisdiction of this court to enforce the ouster, deprivation of respondent's property without due process, and a defense in the nature of a plea in abatement on the ground that there is another action, involving identical issues, pending between the parties. Respondent also pleads that the State Highway Department has exclusive jurisdiction of certain matters herein involved. The relator by reply makes specific denial of the matters set up in respondent's answer and return.

After the joinder of issues as just stated this court, by its order, appointed the Honorable Ben Ely as Special Commissioner to hear the evidence and report the same with his findings of fact and conclusions of law thereon to the court. Pursuant to the appointment the commissioner entered upon and completed the hearing so authorized and, on August 2, 1935, filed a report of his action, findings of fact and conclusions of law, accompanied by a transcript of evidence taken by him. To such report the respondent filed its exceptions. At the ensuing September Term of this court the cause was heard on briefs and oral arguments of the counsel and submitted.

In the exceptions, thirty-eight in number, error is assigned upon the rulings of law, severally, as contained in the commissioner's opinion, or conclusions of law. In the view we take of the case it is not needful that we review them. Exception No. 17 may be noted. In it exception is taken to a specified reference, apparently not based on a matter of record, made *arguendo* by the commissioner. This seemingly offending, though unimportant, reference will be excised. Mention is made in respondent's brief of an error in figures which we find to be a manifest clerical error. This will be corrected by substituting the proper digit in place of the improper one which counsel have pointed out.

Only two of the assigned errors, Nos. 12 and 36, relate to findings of fact. These are, respectively, (12) that the "finding and conclusion that the requests on the part of the respondent for a renewal of franchises place the respondent in a position that it knew that it was outstaying its legal tenure of life in the City of California, is contrary to the testimony given by the witnesses;" and (36) "The Commissioner erred in finding and concluding that the value of respondent's properties is only $88,639.00."

We have carefully considered the evidence upon which the commissioner predicated his findings and conclusions just referred to,

and we are of the opinion that the evidence is sufficient to support the same.

We have also carefully considered all the commissioner's findings and conclusions in the light of the briefs and arguments of the counsel as presented in this court. Being of opinion that such findings and conclusions are correct and proper, we overrule each and all of said exceptions and adopt, as the opinion of this court, the commissioner's report, without its introductory matter, and with such other elision or such interpolation as may appear enclosed in brackets. The report, quotation marks omitted, is as follows:

The city of California is and was at all times herein a municipal corporation, duly organized and existing under the laws of the State of Missouri, a city of the fourth class. It is located in Moniteau County. It will be hereinafter spoken of as "the City."

Respondent, the Missouri Utilities Company, hereinafter called "the Utilities Co.," is a corporation duly organized under and by virtue of the laws of the State of Missouri (the company was originally organized as the "Public Service Company of Missouri" and the name subsequently changed to the "Missouri Utilities Company"), for the purpose, among others, of producing and/or distributing and selling electric current for light and power purposes. It was incorporated in 1919. The common stock of the Utilities Co., is all held by a holding company known as the Community Power & Light Company, hereinafter called the Community Company, which is organized under the laws of Delaware. The members of the Board of Utilities are all connected with the Community, and the latter company furnishes the President of the former, and pays his salary. The Community receives a percentage of the gross income of Utilities, in addition to interest on its bonds hereinafter mentioned and the dividends, if any, declared on its common stock. In return for this percentage of the gross, Community furnished Utilities with certain managerial, financial, legal and purchasing services. This service is furnished through Stone and Webster Service Corporation.

On January 22, 1909, some years before the adoption of the Public Service Commission Act but while what is now Section 7683, Revised Statutes 1919 (Mo. Stat. Ann., p. 6049), was in full force and effect the board of aldermen of the city adopted an ordinance, set out in full in the record granting to one S. W. Carver, his successors and assigns, a franchise to erect and maintain in the city an electric light and power plant and distribution system, with the right to place the wires and poles connected therewith on the streets, alleys and other public places in the city. Said franchise was by its terms to expire twenty years from its effective date. The ordinance was duly submitted to the qualified voters of the city and was approved by

the requisite majority thereof and went into effect February 16, 1909, after being accepted by Carver.

Carver thereafter constructed the plant mentioned in the ordinance and a distribution system connected therewith. He subsequently assigned the franchise to F. T. Porter. In April, 1924, respondent applied to the Public Service Commission for a certificate of convenience and necessity with authority to purchase the equipment and franchise aforementioned from said Porter. The evidence shows that notice of such application as well as other applications herein mentioned was served upon the mayor of the City (The original order is at A-120 permitting the purchase of the "California Group" by respondent from Porter. But the financing scheme was disapproved and action upon the application for a certificate of convenience and necessity held in abeyance. After rehearing denied, an application for an "Amended Supplemental Order" was filed. This application sought the right to issue bonds in the amount of $468,000 and stock in the amount of $45,000, represented on the property side of the balance sheet by the California Group and other contemporaneously acquired and constructed properties. This application was denied. The application for a certificate of convenience and necessity was held in abeyance. The certificate of convenience and necessity was finally issued on July 1, 1924. On the same date the respondent was authorized to issue bonds to the amount of $434,500 and stock to the extent of $45,500 to finance the foregoing transaction. The details are stated because of the fact that the record is somewhat confused and some exhibits are out of order. Notice of the pendency of these proceedings was served on the then mayor or relator city) but that the city did not appear at said hearing. Permission was granted as prayed and the property and franchise conveyed to respondent Utilities Co. Permission was also given the Utilities Co. to issue common capital stock of the par value of $45,500 and seven per cent bonds of the par value of $434,500, which in part represented the amount invested in the California property, and were in part secured by a mortgage on the California property. (In order to show the consideration paid for the California property a more extended analysis of the transaction is necessary. Porter owned, in addition to the plant and distribution system at California (hereinafter called the city property) properties at Bunceton, Tipton, Clarksburg, Speed and Belle Air. The Versailles Light & Power Company owned a plant at the latter city and also a high line and all the stock of the company owning a light and an ice plant at Eldon and a property at Cardwell with another high line connected therewith. All of these properties were bought and new connecting lines constructed with the $480,000 raised by the authorized financing. A complete analysis of the Public Service Commission's figures seems to indicate that about $150,000 of this was property allocatable to

the city property.) These securities were transferred to the Community Company, which thereupon deposited the bonds under a trust agreement and issued to the public its own bonds based upon this security. None of these bonds was to become due until after the expiration date of the California franchise, but they are due at the date of this trial and are in default. The common stock of Utilities which, as has been said, is held by Community, for many years paid dividends but of recent years its dividends have been passed. None of the common stock and bonds authorized in the orders of the Public Service Commission above mentioned is held by the general public but all of both issues is held by the parent holding company.

The local steam plant at California which had been constructed by Carver was abandoned and in lieu thereof, a high line was constructed from Sedalia to California from which Utilities furnished current not only to California but to a number of other communities in the neighborhood. From Tipton to California, however, the line is used only for the supply of California. This construction was all accomplished before the expiration of the franchise in 1929.

A considerable amount of evidence as to the present value of respondent's property at California was introduced. Such evidence has a bearing only on two questions in the case:—the defenses set up as to equitable estoppel and deprivation of property without due process of law. As far as the first of these defenses is concerned only the amount of damage directly done by the actual ouster, if any be ordered, is pertinent. Likewise under the second defense only the value of the property actually taken or destroyed or made valueless by an ouster can be considered. Hence we are concerned with the actual value of property at the present time only and not with the value of property already abandoned.

An appraisement and valuation of the California property was made by and under the direction of respondent's witness Veatch. The testimony of this witness, as well as his general manner, impressed one with his absolute honesty and thorough qualification for the work done. His appraisal was also done with the most careful and scientific accuracy. It is true that relator's witness Scott differed with Veatch greatly upon many important matters. But the methods used by Scott were far inferior in accuracy to those used by Veatch, and his experience in strictly valuation work was somewhat limited. Further he did not have the opportunity to make as careful an inventory as Veatch made. Veatch's appraisal must then be taken as basically correct. It is, however, subject to certain corrections and deductions which are hereafter set out.

The items listed and which totaled make up the figure of $121,272 given as the total value of respondent's California property may be classified into the following groups: (1) Value of the distribution

system now in use at California, (2) value of property which has been removed from California or not used since November 1, 1934, (3) value of the high line into California, (4) going concern value of the business.

As we have seen item two of the above, which is $19,111, cannot properly be considered in this case. Item one is subject to the following deductions: (1) The testimony of local witnesses who are familiar with the conditions at California shows that the appraisal of the "steam plant" building is too high by $1900. (2) The same testimony shows that the value placed on the office building is too high by $4500. (3) Most of the office equipment is used as a part of the whole district system and would continue to be of value for this purpose even if ouster were ordered in this case. Therefore this item should be cut by $2000. (4) A similar deduction of $500 should be allowed on laboratory equipment. The total deductions from item one should therefore be $8900. Item three impresses one as being based upon too high a percentage allocation for California on the high line which serves a number of other places and ought to be reduced from $28,522 to $25,000, or a reduction of $3522. This makes a total of deductions of $31,533. The total value of the property presently used at California, including the allocatable part of the value of high lines and going concern value would then be $88,639.

It must of course be borne in mind that this does not really measure the actual damage to the company if ouster were ordered, since a good deal of this property could be taken away and used elsewhere in respondent's system. No figures for this salvage value were given in evidence.

The extent of respondent's original investment at California at the time the property was acquired from Porter and the high lines were constructed is hard to determine. The reason for this is that, as already shown, respondent bought from Porter a number of city properties at the same time and for a lump sum price, and that this price was paid for in stock of the Community Company and not in cash. The amount which respondent spent at California in improvements between the acquisition of the property in 1924 and the expiration date of the franchise in 1929, is said by respondent's accountants to be $57,355.35. Since 1929, respondent claims to have spent in improvements at California the total of $9755.80.

Of that sum, however, certain items were for the purchase of equipment used in the whole district and not just at California. (Transportation equipment, laboratory equipment and office equipment.) Other items, while shown in respondent's accounts and under the system of accounting prescribed by the Public Service Commission as capital expenditures, were really in the nature of current expenses. Just how much of this expenditure is represented by prop-

erty which is now in use at California and which would be rendered valueless by ouster is not shown in evidence.

Shortly after the original granting of the franchise the city contracted with Carver to have the latter furnish, at rates set out in the contract, current for street lighting. This contract was never renewed after the franchise expiration but the city continued to buy current from respondent for this purpose. Respondent states that it furnished current for the lights and fan in the city hall without charge but the city claims that it was billed in a lump sum and that it did not know whether charges for the city hall were included or not. (There was much evidence as to the installation of a number of street lights at the request of the city after 1929. The use of these street lights had been entirely discontinued prior to this suit.)

The original franchise fixed certain rates for the sale of current to private consumers. The base rate was 15 cents per KWH. This rate applied to the first 20 KWH. On the next 20 the rate was to be 10 cents and beyond 40 the rate was $7\frac{1}{2}$ cents. After the enactment of the Public Service Commission Act the holders of the franchise, first Porter and then respondent, filed numerous schedules of rates with the commission, differing from the above. The rates under such schedules were substantially lower than the ordinance rates. Thus, e. g., the rates in effect October 31, 1931, for residential users were: first 30 KWH 10 cents; second 30 KWH 7 cents; excess, $3\frac{1}{2}$ cents. These reductions in rates were made voluntarily by the company and were in no instance made on application of the city or the consumers.

The record disclosed that the following taxes have been paid by the company upon its California property and business; General property taxes to State, county and city, *ad valorem* upon the real and personal property within the city; corporation franchise taxes; corporate income taxes; Federal power taxes; during the last few years, the State sales tax. The city charged the company a merchant's license tax or license fee, but this was not upon its business of selling electric current but upon its business of selling electric appliances over the counter.

In 1931 respondent entered into two contracts to supply power to two concerns in the city of California; one with the Moniteau Mills and the other with the Producers' Exchange. These contracts were of indefinite extension but were cancellable by either party on thirty days' notice to the other. The Producers' contract has been discontinued but the Moniteau Mills contract is still in existence.

In 1929, the year in which the franchise expired, the respondent requested the city to grant it a new franchise. This request was refused. Another such request was made and refused in 1931. Several

suggestions were made by respondent to different members of the city council and other city officials that if a contract or franchise were granted the lighting rates would be reduced. In 1929 an election was had to determine whether or not the city should build its own plant. The proposition was lost. Another such election was held in 1930. In fact ever since 1929 the question of municipal ownership has been agitated. All of this the company officials knew and they engaged in a campaign against the proposal. The company procured copies of all council proceedings in regard to electric plant matters. In 1934 the present respondent instituted certain proceedings in the state courts to prevent the building of a municipal plant. During the pendency of such litigation Judge Kelso, an officer and attorney of respondent, told the mayor of the city that if the city would agree to let the company stay in town and compete with the municipal plant these proceedings would be dismissed.

Later in 1934, after the city had made application for a PWA loan and grant to construct a municipal plant, the now respondent instituted an equitay suit in the District Court of the United States for the Western District of Missouri to enjoin the making of such loan. The case was decided against the company by Judge Otis, on motion to dismiss the bill, filed by Public Works Administrator Ickes, and the case was appealed to the Circuit Court of Appeals for the Eighth Circuit. The municipal plant was, however, actually erected and went into operation on or about December 1, 1934. It is still in operation and is furnishing about half the current consumed in the city and a considerable majority of the domestic users.

I. Respondent's return pleads by way of abatement to the present proceeding that there is another action pending between the parties hereto, involving the same issues. In support of this allegation respondent offered in evidence the transcript of a suit now pending before the Circuit Court of Appeals for the Eighth Circuit entitled ''Missouri Utilities Company, a corporation, appellant, v. City of California, Missouri, a municipal corporation, et al., appelless. . . .'' The commissioner considered this issue at length and decided it adversely to this respondent. But the issue has fallen out of the case by reason of the dismissal of the appeal, on motion of appellees in said suit in the Circuit Court of Appeals. [Missouri Utilities Co. v. City of California, 79 Fed. (2d) 1003, Id. (Dist. Ct. Op.), 8 Fed. Supp. 454.]

II. Respondent next contends that the Public Service Commission Act has given to that body the power and function of issuing certificates of convenience and necessity to electric power and light companies and that such a certificate was duly issued to it. There-

fore only the commission has power to revoke the authority issued and this court is without original jurisdiction in the present case.

The fallacy of this argument is that the issuance of a certificate is only one of the facts made by law prerequisite to the exercise by respondent of the privilege of keeping its lines on the streets of California. The law, as interpreted by this court in previous decisions, fixes as conditions precedent to creation of that privilege two things: (1) The granting of a certificate by the commission, and (2) the granting of a franchise by the city, which, like the commission, acts, in this regard, as agent of the State. Unless the permission of both agencies has been obtained, the privilege of using the streets for this purpose never comes into being; and when the city limits the life of the franchise granted to twenty years, as it must, and that period expires, the privilege of so using the city's public places comes to an end. The continued use is illegal. The corporation acts outside of its granted powers. Now clearly this is precisely the type of case in which *quo warranto* lies. The jurisdiction of this court is undoubted.

These matters received careful consideration and were discussed in much detail and with copious citation of authorities in State ex inf. Shartel ex rel. Sikeston v. Missouri Utilities Company (1932), 331 Mo. 337, 53 S. W. (2d) 394, 89 A. L. R. 607, which clearly declares the law in accordance with the foregoing statement. Further this court has held that the commission is without power to revoke a certificate once granted upon the ground that the public necessity for it has ceased to exist. [State ex rel. Sikeston v. Public Service Commission (1935), 336 Mo. 985, 82 S. W. (2d) 105.] The point must be ruled against respondent.

III. Respondent next asserts that there is a defect of parties defendant to the present action. The basis of this contention is the following: as previously stated and as will be shown in more detail presently, respondent, claiming to rely upon the certificate of convenience and necessity mentioned and upon orders of the Public Service Commission, issued a considerable amount of common stock and also a large number of bonds to the Community Company. These securities in part represented the value of the California property. They are now outstanding in the hands of the Community Company. Such company, as shareholder and bondholder, says respondent, ought to have been made a party to this proceeding.

A corporation is, in law, a person. It is a juristic entity separate and apart from the persons who happen to be its shareholders and its creditors, secured and unsecured. [Dartmouth College.v. Woodward (1819), 4 Wheat. 518, 4 L. Ed. 629.] Its right to exist as a corporation is a franchise granted it by the State. Its property is

held by it as such separate legal person. The legal title is in the corporation as such. Its shareholders are merely *cestuis que trustent*. Its bondholders are only secured creditors like the creditors of a natural person. The power of a public utility corporation to act as such and its privilege to use the public highways in a way different from that in which the ordinary citizen uses them are secondary franchises also conferred by the State and are part of the property held by the corporation as a legal person. Hence when it is questioned whether or not those powers and privileges still exist it is the legal owner of them which must be brought into court.

Where a writ of *quo warranto,* or an information in the nature thereof, is filed to test the existence of a corporation which, it is claimed, has never really been created by the State at all, the proper defendants are the natural persons asserting the right to act as a corporation. But where it is asserted that a corporation, recognized to legally exist, has overstepped its powers it, and it alone is the proper defendant in *quo warranto.*

Thus the Springfield Court of Appeals in State ex rel. Wear, Pros. Atty., v. Business Men's Club (1914), 178 Mo. App. 548, stated the rule as follows:

"Where the object is . . . to oust the corporation of some power which it unlawfully exercises, then the proceeding is properly against the corporation."

Again, this court in State ex rel. Gentry, Atty. Gen., v. Bray (Monarch Transfer and Storage Co.) (1926), 323 Mo. 562, 20 S. W. (2d) 60, quoted with approval the statement in Rex v. Amery, 2 T. R. 528.

"If *quo warranto* be brought for usurping to be a corporation, it should be brought against the particular persons because in disaffirmance of the corporation; but if it be brought for liberties claimed by a corporation it must be brought against the corporation itself."

Here the charge in the information is that the company, whose legal existence is admitted both in pleadings and proof, is usurping privileges which it once possessed, but possesses, it is said, no longer. Hence the proper party defendant and the only proper party defendant is the corporation itself. There is therefore no merit in this defense.

■ IV. Respondent next contends that since two of the streets on which its lines and poles are located are designated as a part of the state highway system, the highway department alone has jurisdiction over them and the poles can be removed only upon order of the commission.

Section 8134, Revised Statutes 1929 (Mo. Stat. Ann., p 6969), provides in part:

"The state highways as herein designated shall be under the . . . control of the commission."

Section 8109, Revised Statutes 1929 (Mo. Stat. Ann., p. 6895), provides in part:

"The location and removal of all telephone, telegraph, and electric light and power transmission lines, poles, wires, and conduits and all pipe lines and tramways, erected or constructed, . . . by any corporation, association or persons, within the right of way of any state highway, *insofar as the public travel and traffic is concerned, and insofar as the same may interfere with the construction or maintenance of any such highway,* shall be under the control and supervision of the State Highway Commission . . . *Provided, however,* that the effect of any change ordered by the commission shall not be to remove all or any part of such lines, poles, wires, conduits, pipe lines or tramways from the right of way of the highway." (Our italics.)

Section 8133, Revised Statutes 1929 (Mo. Stat. Ann., p. 6929), permits the location of a state highway, under certain circumstances, through city streets. [Cf. State ex rel. Hannibal v. Smith (1934) 335 Mo. 825, 74 S. W. (2d) 367.]

It was, however, clearly, not the intention of the Legislature to vest the commission with jurisdiction over these portions of city streets, so designated as parts of state highways, superior to the jurisdiction of the municipal authorities. Certainly the city's police power as to such streets remains unaffected. Orders under Section 8109 are limited to those necessary to prevent interference with traffic, on the highways and with highway construction. In matters immediately concerned with the construction of paving of the highways and their maintenance, the commission has jurisdiction. But in other matters the city's power continues. This asserted defense therefore cannot avail respondent.

V. Respondent's next contention is based on Rule 33 of this court. Counsel contend that said rule was not complied with in that no notice of the filing of the original information was served upon respondent before such information was presented to the court. The fact that no such notice was given is conceded. (But in this instance it is apparent that the respondent has suffered no inconvenience or injury thereby and full opportunity has been afforded it to make defenses of its own choosing and to safeguard all its substantial rights in the premises.) Further the court retains the right to dispense with the necessity of notice under certain circumstances in any kind of case, and as the court permitted the information to be filed, in this case, it must be presumed that it did so upon proper grounds. [State ex inf. McKittrick ex rel. Lebanon v. Telephone Co., 337 Mo. 642, 85 S. W. (2d) 613.]

VI. The principal defense herein is that of alleged equitable estoppel. The evidence touching this matter is long and involved. As a preliminary to any discussion of it we must attempt to state some of the general principles of law bearing upon the doctrine. Lord COKE defined an estoppel as where a man by his own acts or acceptance is concluded from saying the truth. No more exact connotative definition, covering all of the cases, can be attempted. We may say of this term what Mr. Justice MILLER said of "due process of law," that it is better to leave its definition to the gradual process of "judicial inclusion and exclusion." Decided cases are often of little value, here, outside of the identical state of facts passed upon in them by the court. Yet certain essential elements are necessarily present in all cases. We may speak of these elements as (1) a *representation* by the party estopped to the party claiming the estoppel as to some material fact, which representation is contrary to the condition of affairs later asserted by the estopped party; (2) a misreliance upon this representation by the party claiming the estoppel; and (3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his misreliance thereon. [State ex inf. Shartel ex rel. Sikeston v. Missouri Utilities Co., supra.]

(1) As to the representation: It may be and often does consist of a verbal statement of the estopped party to the effect that a given thing is true or not true, contrary to the actual facts of the case and contrary to the estopped party's later claim. But the representation may also be by acts of the estopped party, other than verbal statements which the party claiming the estoppel might reasonably rely upon. Indeed, there are cases where the mere silence of the estopped party and his failure to assert the right later claimed will be construed as a representation that he does not have the rights which he later attempts to assert.

Thus SHERWOOD, C. J., in Perry v. Hall (1882), 75 Mo. 503:

"The term 'representation' is used for convenience. . . . It is not necessary that there should be an express statement. It is enough that a representation is implied, either from acts, *silence* or other conduct." (Our italics.)

HARLAN, J., in Kirk v. Hamilton (1880), 102 U. S. 68, 26 L. Ed. 79, quoting from Chancellor KENT:

"There is no principle better established, in this court, nor one founded on more solid considerations of equity and public utility, than that which declares, that if one man knowingly, *though he does it passively,* by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his own claim, shall not afterwards be permitted to exercise his legal right against such person." (Our italics.)

In this connection see, also, South Penn Oil Co. v. Calf Creek Oil & Gas Co. (1905), 140 Fed. 507; Newfield Bldg. Co. v. Mohican Co. (1927), 105 Conn. 488, 136 Atl. 78; Annotation 76 A. L. R. 304.

It is not every case of silence on the part of one having a legal right which will bar its future assertion. For a "standing by" to become the predicate of equitable estoppel, it is necessary that the person remaining silent be under a duty to speak. In other words he must speak only when common honesty and fair dealing demand that he do so. There are two corollaries to this principle: (a) A party is under no duty to make claim of his legal rights unless he knows what those rights are, *Lammot v. Bowly, 6 Harr. & J.* 500, and (b) his silence cannot estop him unless he had a fair opportunity to assert his claim. [Wescott v. Meeker (1909), 144 Iowa, 311, 29 L. R. A. (N. S.) 947, 122 N. W. 964.]

■ (2) *Misreliance.* The second element which must be present in every case of estoppel is that we have called misreliance—using a word coined by Professor Woodward in his text on Quasi Contracts. It is essential that the party claiming the estoppel should have had the representation of the estopped party communicated to him; that he should have believed it; and that his future acts should have been conditioned by such belief. If he knew that the facts were otherwise than as represented but nevertheless proceeded to act upon the representation, he cannot expect the court to extricate him from a predicament in which his own foolhardiness has involved him. [St. Louis Safe Deposit & Sav. Bank v. Kennett Estate (1903), 101 Mo. App. 370, 74 S. W. 474; Calloway Bank v. Ellis (1922), 215 Mo. App. 72, 238 S. W. 844; Laughlin v. Well (1926), 314 Mo. 474, 283 S. W. 990; Steel v. St. Louis Smelting & Ref. Co. (1882), 106 U. S. 447, 27 L. Ed. 226; Hall v. Hobart (1911), 108 C. C. A. 348, 186 Fed. 426.] Though it would seem that such knowledge must be actual as distinguished from merely constructive. [Wilkinson v. Lieberman (1931), 327 Mo. 420, 37 S. W. (2d) 533.]

■ (3) *Change of Position:* Finally there must have been some definite act on the part of the party claiming the estoppel, in reliance on the representation of the estopped party, which has changed his condition for the worse. He must have suffered a legal detriment; but the legal detriment must not be merely formal, as it is in the case of the doctrine of consideration in the law of contracts, but actual. His condition must be such that, if the estoppel be not permitted, he will suffer damage.

■ Under the law of this State, as it has existed for many years, the doctrine of estoppel, as thus sketched in rough outline, applies, not only to natural persons and private corporations, but to municipalities as well, and that even though such municipalities are acting in a "governmental capacity." [Union Depot Co. v. City of

St. Louis (1882), 76 Mo. 393; Town of Montevallo v. School District (1916), 268 Mo. 217, 186 S. W. 1078; City of St. Joseph v. Terminal Railroad Co. (1916), 268 Mo. 47, 196 S. W. 1080; City of Mountain View v. Telephone Co. (1922), 294 Mo. 623, 243 S. W. 154; State ex inf. Shartel ex rel. Sikeston v. Missouri Utilities Co., supra; State ex inf. McKittrick ex rel. Lebanon v. Telephone Co., 337 Mo. 642, 82 S. W. (2d) 613.] It is true that courts, with just regards to the rights of the public, apply the doctrine to cities and counties with great caution. [State ex inf. Shartel ex rel. Sikeston v. Missouri Utilities Co., supra; City of St. Joseph v. Terminal Railroad Co., supra.]

In this connection relator contends that there is an essential difference in the doctrine of estoppel when applied to a municipality and when applied to private persons or corporations. Learned counsel admits that under proper circumstance a "standing by" may supply the element of representation, when the estopped party is an individual, but contends that it never can, when the principle is invoked against a governmental unit. He cites the case of City of Pacific v. Ryan (1930), 325 Mo. 373, 28 S. W. (2d) 652, in support of such contention. We do not so understand the holding of that case. It merely held that the defendant therein did not *rely* on any representation of the city and hence could not invoke the alleged estoppel. On the contrary, the case of City of St. Joseph v. Terminal Railroad Co., supra, seems to recognize that the doctrine of "standing by" may apply to a municipality, and the cases of Chicago v. Union Stock Yards & Transit Company (1896), 164 Ill. 224, 35 L. R. A. 281, 45 N. E. 430; Pembroke v. Canada C. Railroad Co. (1883), 3 Ont. Rep. 503; and Hagerstown v. Hagerstown Railroad Co. (1914), 123 Md. 183, 7 A. L. R. 1239, 91 Atl. 170, directly so hold. But see *contra*, Bangor Township v. Bay City Traction & Electric Co. (1907), 147 Mich. 165, 7 L. R. A. (N. S.) 1187, 110 N. W. 490, and Morris, etc., Railroad Co. v. Newark (1844), 10 N. J. Eq. 352.

In the case at bar the facts relied upon to constitute the alleged estoppel fall into two categories: Those happening before the termination of the franchise in 1929, and those happening after such termination. They must be discussed separately.

Relator's counsel insists that all consideration of the first class of acts is foreclosed by the decision of State ex inf. McKittrick, ex rel. Lebanon v. Telephone Co., supra. It is true that in that case the court made the statement, to which great weight must be attached, that certain acts therein relied upon could not become the predicate of an estoppel since they transpired while the legal franchise was still in existence. Yet, as we have seen, each case of estoppel must in the nature of things stand on its own bottom. We shall proceed to discuss both classes of acts.

(1) Transactions prior to the termination of the franchise.

(a) *Representation by the city.* Respondent contends that when it applied for a certificate of convenience and necessity, for leave of the Public Service Commission to purchase the Porter property and rights at California, and for leave to issue its bonds and stocks, based upon the value of the property so acquired, the city had notice of its (respondent's) plans. That the city must have known that respondent was purchasing the property on the assumption that it was getting a perpetual franchise or indefinite permit. That the city thereupon stood by and was silent. That it failed to appear before the commission and register any protest.

(b) *Misreliance;* Respondent contends that it in good faith acted upon the assumption that it was getting an indefinite permit which would supersede the old franchise.

(c) *Change of position;* Respondent contends that it then proceeded to invest some hundred and fifty thousand dollars in the California property, in reliance on the certificate issued to it, which it thought was a perpetual franchise.

To these contentions relator answers that the law of the State was plain that a certificate of convenience and necessity was good only so long as the holder had a local franchise. That respondent, the city, and the commission all knew this or at least ought to have known it. That, if respondent wanted to pay Porter several thousand dollars for a group of properties including the California property as one item, taking a chance that it could get the franchise renewed in 1929, it was not the city's duty to point out the lack of economic wisdom in such a course.

As to the fact of change in respondent's position there can be no doubt. It in reality paid out, as we have said, in the neighborhood of one hundred and fifty thousand dollars for the California property alone. True most of this was paid for in stock and bonds, —stock and bonds which were retained by the holding company. But the holding company then, on the basis of such securities, issued its own stock and bonds to the public in payment of the purchase price of existing properties and to raise money for new construction. If the Utilities Company be ousted someone will suffer a distinct loss.

Did the company do this under the expectation that it would get, through its certificate of convenience and necessity, an unlimited franchise in the city? The city says that the law was clearly to the contrary and that the respondent must be presumed to know the law. But the maxim *ignorantia iuris nemonem excusat* applies principally to the criminal law. It may sometimes be disregarded in a case of equitable nature though legal form like the present. [Valley Railroad Co. v. Lake Erie Iron Co. (1888), 46 Ohio St. 44, 18 N. E.

486; Harse v. Pearl Life Assurance Co. (1904), 1 K. B. 558. See Note 24 Harvard Law Review, 394.]

We, however, are faced with this dilemma. If the company claims not to have known the law and to have acted on an incorrect assumption of the law, fairness requires us to assume that the city fathers of California suffered from like ignorance. If this were true the city could have been under no equitable obligation to assert a right it did not know it had. [Lammot v. Bowly, supra.] On the other hand, if the city must have been presumed to have known the law, what can we say of the respondent company? Certainly, it was in position to be acquainted with the legal rules governing its business. But if the company, knowing legal limitations imposed on its existence in the city or having good reason and opportunity to know the same, with foolhardy recklessness, went ahead and invested its money on the chance that it could get a franchise renewal, or on the chance that it could convince the courts that the Public Service Commission Act had repealed the laws requiring local franchise, then it is entitled to no standing in a court of conscience.

The close analogy between the facts of this case and those of State ex inf. McKittrick, ex rel. Lebanon v. Telephone Co., supra, lend additional support to this position. The issue of estoppel, as far as the transactions before 1929 are concerned, must be ruled against respondent.

(2) *Transactions after the expiration of the franchise.*

(A) *Acts of the City.* Respondent sets up the following acts on the part of the city, after the expiration of the franchise in 1929, as predicate of the estoppel sought: (a) failure from 1929 to 1935 to attempt an ouster proceeding, (b) taxation of the respondent in various ways, (c) taking free current supplied by the company for the city hall, (d) ordering in new street lights.

(B) *Acts of respondent in reliance thereon.* Respondent claims that it relied upon these acts of the city and was led thereby to think that its franchise was still good, and as a result invested some $9000 in improvements to its system in the city. As we have said, however, only some six thousand dollars or even less of this amount was really applicable to the city system.

As to the first element of representation on the part of the city, viz., the failure to bring this proceeding for six years, we may say that the company was clearly not lulled into inaction or deceived thereby. The record discloses that in 1929 the company asked for a renewal of the franchise and did not get it. They made another request about a year later and were no more fortunate. During all of the period from 1929 to 1935 there was a strong opposition to the company in the city council and a continuous agitation in and out of the council for municipal ownership. Not only did the company

know this but it was conducting at all times vigorous counter propaganda. We are impressed from this record with the fact that the company at all times knew and well knew that it was outstaying its legal tenure of life in California. The sword of Damocles was hanging over its head and its officers were not unaware of the situation. Hence the element of reliance on any representation of the city, if any existed, was totally absent.

What has just been said applies to all of the alleged acts of the city after the expiration of the franchise. But concerning some of them a word more may well be added. On the matter of street lights installed. There were about eight of these. The money spent thereon by the company was such a negligible amount that the maxim *"De minimis non curat lex"* might well apply. In any event they have all been removed or put out of commission before the bringing of this action, and the company can suffer no damage in relation thereto by a judgment of ouster herein. The company was paid for the electricity used in these lights, and we cannot see how the use of the same by the city, duly paid for, could be construed as a representation that the company would be allowed to continue in the city indefinitely.

The matter of taxation of the company by the city presents a more difficult problem. Some expressions of the court in State ex inf. Shartel ex rel. Sikeston v. Missouri Utilities Co., supra, seem to lend countenance to the view that taxation may be a possible basis of estoppel. The cases of Spokane Street Ry. Co. v. Spokane (1893), 6 Wash. 521, 33 Pac. 1072; Chicago, R. I. & P. Ry. Co. v. Joliet (1875), 79 Ill. 25; and Chicago & N. W. Railroad Co. v. People (1878), 91 Ill. 251, so decide. However, the case of Omaha Electric Light & Power Co. v. Omaha (1909), 172 Fed. 494, affirmed, without discussion of this question (1910), 102 C. C. A. 601, 179 Fed. 455, appeal dismissed (1913), 230 U. S. 123, 57 L. Ed. 1419, hold the contrary. We are at a loss to see how the mere imposition of a general property or income tax or of a sales tax could be construed as an admission that the business so taxed was a lawful one. We are all familiar with the fact that large income taxes have been assessed and collected on the income of bootleggers, gangsters, and racketeers. Perhaps the country's best known racketeer, Al Capone, late of Chicago, is now a guest of the government because he failed to pay an income tax on his ill-gotten gains. Whether this respondent was doing business in California legally or illegally it would still owe the State, county and city a tax thereon. The case is entirely different from one where the city sells a company a license for a definite period and charges a so-called license tax therefor (as was the case in State ex inf. Shartel ex rel. Sikeston v. Missouri Utilities Co., supra). No such license fee for the privilege of doing electric power business in California was charged respondent in this case.

We have reached the conclusion, therefore, that the city is not estopped by any acts subsequent to 1929.

VII. The final issue raised is that of the alleged constitutional rights of respondent. In his brief learned counsel relies both upon the due process clause (Amendment 14, Sec. 1) and the impairment of contracts clause (Art. 1, Sec. 10). The answer and return pleads only the former. Under the settled law of the State respondent cannot avail itself of the protection of the impairment of contracts clause since the question was not raised at the first moment when it was "Procedurally possible." [Lohmeyer v. St. Louis Cordage Co. (1908), 214 Mo. 685, 113 S. W. 1108; State v. Jones (1925), 269 S. W. 954.] However, owing to the magnitude of the issues involved we will consider the effect of both provisions.

(1) *Respondent will not be deprived of any property without due process of law* by the decision of this court ousting it from California. The right to use the public streets for any purpose except ordinary traffic is not a vested right of the citizen. He may so use such streets only when given permission so to do by the State. [State ex inf. Shartel ex rel. Sikeston v. Missouri Utilities Co., supra.] In strict sense this is a privilege not a right. It is a privilege created by specific state action. Such a privilege was granted by the State, acting through its agent the city of California, to Carver. It was a limited privilege and completely expired and ceased to exist in 1929. It was accompanied with the power to transfer such privilege to another under certain conditions. But the thing transferred was the original privilege and nothing more. When respondent took this privilege it had only a few years to run. The case is similar to a lease for years with power to sublet or assign. If the original lessee assigns to another the assignee gets only that part of the lease which has not yet run. At the expiration date of the lease the assignee's rights cease. In 1929 respondent's privilege to use the streets of California ceased by the terms of the original grant. It no longer existed at all. Hence respondent has, in this respect, no property and so cannot now be deprived of property. [Scott County Road Co. v. Hines (1909), 215 U. S. 336, 54 L. Ed. 221.]

(2) *Nor would the action of this court in ousting respondent impair the obligation of any contract* of the State with respondent in violation of Section 10, Article 1 of the Federal Constitution. It is true, as respondent contends, that the charter of respondent and its secondary franchise constitute contracts between it and the State. [Dartmouth College v. Woodward (1819), 4 Wheat. 418, 4 L. Ed. 629.] But again we must ask what that contract was. As originally made the contract was to expire in 1929. Absent further action, on the part of the parties, modifying it, the contract ceased to exist as

of that date and the obligation of the contract also ceased to exist. You cannot impair the obligation of a nonexistent contract.

But respondent says that the State by granting it a certificate of convenience and necessity in 1924 modified the contract and made it a perpetual one like that in the Dartmouth College case, supra. However, the Public Service Commission Act, as we have seen, specifically made the consent of the municipality a necessary condition precedent to the granting of the certificate. Section 5193, Revised Statutes 1929 (Mo. Stat. Ann., p. 6617), was part of the original Act of 1913. This section has been construed by the commission itself in accordance with the theory herein stated prior to the issuance of the certificate to respondent. [2 P. S. C., Mo. Rep. 1.] Hence it is obvious that the granting of the certificate did not lengthen the life of the original contract between respondent and the State and that the same expired in 1929, and that a decision of ouster cannot now impair the obligation of that contract.

It is therefore the conclusion of the commissioner that the rights of the respondent to use the streets, alleys, and public places of the city of California for its poles, wires, transformers, and electrical equipment expired in 1929. That nothing was done to extend the length of this right. That the city and State are not now estopped from insisting upon ouster.

The commissioner therefore recommends that the judgment of this court be for the relator and against the respondent as in the information prayed.

The commissioner recommends that the respondent be ousted from the use of said streets, alleys, and public places as aforesaid.

Since there is no evidence of bad faith or willful wrongdoing on the part of respondent, the commissioner recommends that no fine be assessed under the ordinary practice in *quo warranto*.

Since a large number of business enterprises and private individuals in the city are getting their only electric supply from respondent, and since it would take a considerable time for them to arrange to get it from the city, and since the removal of respondent's equipment with minimum damage will require a considerable length of time, the commissioner recommends that respondent be given a year to make such removal.

We accept the recommendations of the commissioner as made above —but with a slight modification which will speak for itself—and we order and direct that respondent be granted until October 1, 1936, to remove its poles, wires and other equipment from the streets of the city of California; and that leave be granted to either party herein to move this court, before the date last stated, to modify this order for such removal by extending the time fixed above for such removal, and that the jurisdiction of the court be and it is hereby reserved to

entertain and act upon any such motion filed herein before the expiration of the period last mentioned and thereafter to make such order or orders as it may deem proper and appropriate touching such matter of time extension. Writ of ouster granted as in the information prayed and as recommended in the commissioner's report. All concur.