COLLECTOR OF REVENUE of JACKSON COUNTY, MISSOURI, (Plaintiff) Respondent, v. PARCELS OF LAND ENCUMBERED WITH DELINQUENT TAXES, (Defendant), M. T. WILLIAMS, NORA G. SULLIVAN, THOMAS SULLIVAN and THOMAS EDWARD SULLIVAN, Executor Under the Will of MICHAEL J. SULLIVAN, Deceased, Appellants-Respondents, LAND TRUST of JACKSON COUNTY, MISSOURI, Respondent-Appellant, No. 41757—247 S. W. (2d) 83.

Court en Banc, February 11, 1952.

Rehearing Denied, March 10, 1952.

*Harry Howard* for appellants.

*Arthur N. Adams, Jr.,* for appellant Land Trust of Jackson County.

*Richard K. Phelps* for Collector of Revenue for Jackson County.

*David M. Proctor* and *Maurice Benson* for Kansas City, Missouri, amicus curiae; *Arthur N. Adams, Jr.,* of counsel.

1058

*Blatchford Downing, Robert S. Eastin* and *Caldwell, Downing, Noble & Garrity* for The School District of Kansas City amicus curiae.

ELLISON, C. J.—Originally this was Land Tax Suit No. 3 brought by the Collector of Revenue of Jackson County under the "Land Tax Collection Law," Sec's 141.210-810, R. S. 1949; Mo. R. S. A. §§ 11201.1-53; Laws Mo. 1943, pp. 1029-1062, to foreclose the lien on a great number of parcels of land in that county for state, school, county and city taxes delinquent for seventeen years, 1927-1944. Among these was a tract described as Lot 7, Resurvey of Block 1, Chase's Subdivision, an addition to Kansas City, Missouri, upon which was a twelve-apartment building located at 13th Street and Brooklyn Avenue. The title stood in the name of C. M. Oxley, as last known record owner.

After due service upon her by mail and publication, as provided in Sec's 141.410-460; Mo. R. S. A. §§ 11201.15-19, the cause was heard in the Jackson County Circuit Court, Division I, and a judgment of foreclosure rendered against her by default on January 12, 1946, under Sec's 141.480 and 141.500; Mo. R. S. A. §§ 11201.23 and 11201.24, finding the taxes and costs due totaled $23,492.29, and that they constituted a lien on the lot, and ordering a foreclosure thereof by public sale. The defendant Oxley continued in default without

filing an answer, motion for rehearing or appeal throughout the waiting period of six months allowed her by Sec. 141.520; Mo. R. S. A. §11201.25. On October 15, 1946, after three ineffectual efforts to sell the tract at public auction for the total amount due in the sum of $23,492.29 as aforesaid, the same was struck off and sold by the sheriff for that amount under Sec. 141.560; Mo. R. S. A. § 11201.27 to the "Land Trust" created by Sec's 141.700 and .141.720 of said Land Tax Collection Act. Mo. R. S. A. §§ 11201.36, 11201.37. He so reported in his report of sale.

Over three months later, on or about January 20, 1947, the representative of a real estate corporation, acting in behalf of a prospective purchaser, M. J. Sullivan, approached the County Collector's office and the delinquent tax attorney to ascertain whether the tract could be redeemed at a desirable price. The owner, C. M. Oxley, had agreed to accept $2500 for her title. The County .Collector's attorney "o. k.'ed" the petition to reduce the delinquent tax indebtedness of $23,492.29 for which the tract had been sold by about two-thirds to $7845.60, of which $2845.60 would go to Kansas City and $5000 to Jackson County and the School District.

The county court of Jackson County approved that compromise. And the minutes of the Kansas City Board of Delinquent Tax Adjustment recited that the Board would accept a settlement of the City's part of the taxes for the amount named above. The compromise also was agreeable to the prospective purchaser M. J. Sullivan. So the real estate corporation acting for Sullivan on or about January 21, 1947, had its bookkeeper M. T. Williams, as straw party or trustee for Sullivan and his heirs, take a deed to the lot in his own name from the delinquent taxpayer C. M. Oxley and her husband, at her price of $2500.

Williams by attorney then filed in circuit court three days later on January 24, 1947, a motion to vacate the previous default judgment of foreclosure of the lot entered January 12, 1946, and the sale thereof at auction on October 15, 1946, to the Land Trust, which, thereafter held the title under Sec's 141.700, Mo. R. S. A. § 11201.36, and 141.750, Mo. R. S. A., § 11201.40. The grounds alleged in Williams' motion were: (1) that he had at all times been desirous of paying the delinquent taxes against the lot, but was delayed in doing so on account of certain flaws in the title which he deemed it necessary and expedient to correct before making such redemption; (2) that he (Williams) was now ready and willing to pay all City, County, School and State taxes against the lot at a figure satisfactory to the City, County, School and State; that it had not passed into the hands or ownership ██ of any other person since the purchase thereof by the Land Trust; and "that *said Land Trust is agreeable to redemption of the land being made from said sale.*" (Italics ours)

Most of this motion was misleading or unsound in fact. It did not clearly disclose that its real object was to carry out an arrangement already made by a real estate speculator, Sullivan, and the county court whereby the delinquent taxes would be cut two-thirds. Neither was it true that Williams had ''at all times'' been desirous of paying the taxes on the lot, but had delayed doing so because of flaws in the title. He had held the title for only two or three days, and there were no flaws in it so far as this record shows. Beyond that, the statement in the motion that the Land Trust was *agreeable* to the redemption of the lot from the foreclosure sale was not true. The Land Trust was not even notified of the filing of Williams' motion to vacate and redeem the lot from the foreclosure judgment of January 12, 1946, and the execution sale under it to the Land Trust on October 15, 1946.

The motion was taken up by the circuit court instanter (January 24, 1947) in the absence of the court reporter and without notice to any adverse party, and was sustained on the same day and the previous default foreclosure judgment and sale were vacated and set aside. When the sheriff's report of sale of the various delinquent lands was filed on February 5, 1947, it still contained a recital of the foreclosure and sale of the lot here involved to the land trustees on October 15, 1946, but that part was scratched out with lines drawn therethrough. And when the report of sale came up for confirmation on March 31, 1947, a recital was inserted that the sale of the lot had ''heretofore been set aside by the court.'' It is conceded that as soon as the compromise tax settlement was agreed upon on January 23, 1947 Sullivan promptly paid to the County Collector the stipulated amount due the city, county and school district. This was the day before the circuit court vacated the foreclosure judgment and sale.

On May 8, 1947 the circuit court ordered that the foreclosure sale of certain parcels of land in Suit 3, including the lot here involved, be disaffirmed; that the lien of the tax judgments be continued; and that the sheriff readvertise and resell those parcels at public auction for cash at a subsequent sheriff's foreclosure sale. Evidently the court had forgotten that it had already set aside on January 24, 1947 the foreclosure sale of the instant lot to permit a compromise settlement of the delinquent taxes thereon without any foreclosure.

On July 3, 1947 the Land Trust filed a motion to set aside the trial court's order of January 24, 1947 vacating the foreclosure sale of the lot in suit. The trial of the cause on that motion began on November 14, 1947. On that day Williams and the purchaser Sullivan filed a lengthy motion and answer. The case in chief of the Land Trust was brief. It consisted mainly of the documentary evidence hereinbefore reviewed. In addition Mr. Wilson D. Wood, one of the three trustees of the Land Trust, and the Land Commissioner L. C. Miller testified.

1062

Under Sec. 141.720, Mo. R. S. A. § 11201.37 one of these trustees was appointed by the county court, one by the city council of the largest city (Kansas City), and one by the Board of Directors of the most populous school district (School District of Kansas City). Mr. Wood was the trustee appointed by Kansas City. He was an experienced real estate appraiser. He said that he appraised the lot in suit in mid-December, 1946, along with trustee C. R. Benton appointed by the School District, and Land Commissioner L. C. Miller, who had been appointed by the Land Trust under Sec. 141.740, Mo. R. S. A. § 11201.39. They put a value of $15,000 on the property (the lot and building) and instructed the Land Commissioner to refuse any price less than $12,500 net to the Land Trust. This appraisal was made pursuant to Sec's 141.760(1, 4), § 11201.41 (1, 4).

Trustee Wood further stated that "until a long time afterward" he had no knowledge or notice of any proceedings for the divestiture of the Land Trust's title to the lot in controversy. And he specifically denied knowledge of the circuit court proceedings on January 24, 1947 whereby straw party Williams by an ex parte motion filed in Land Tax Collection Suit No. 3 obtained an order vacating the foreclosure judgment and execution sale of the lot to the Land Trust on October 15, 1946. Wood said also that the Land Trust had a regular attorney at that time, Mr. Arthur N. Adams, Jr., and it is undisputed that no notice of Williams' motion was served on him. Trustee Benton, who participated in the appraisal did not testify at the trial, he being abroad at the time.

Land Commissioner Miller testified he was serving as such on January 24, 1947 when the circuit court vacated the foreclosure judgment and sale of the lot in suit so that it could be redeemed for $7845.60, one-third the amount of the delinquent taxes due and nearly $5000 less than the minimum sale value the Land Trustees had put on it. Miller said his office was on the same floor as the circuit court room, but that he received no notice of the hearing on the motion to vacate and did not know of it until the sheriff came into his office later about March 12, 1947 and changed his report of sale on file there by scratching out the part showing the sale of the lot in controversy to the Land Trust.

On behalf of the appellants-respondents Williams and the Sullivan heirs [Sullivan having died in the interim] testimony was adduced from two assistant city counselors E. R. Seaver and Henry H. Fox, Jr., and a clerk-stenographer Mary Diviney in the office of Delinquent Land Tax Attorney Thice. Mr. Seavers produced records from the office of the Kansas City Board of Delinquent Tax Adjustment showing that at meetings held on January 20 and January 27, 1947, the Board and Delinquent Tax Attorney Thice agreed to settle the City's claim for delinquent taxes on the lot in controversy at the compro-

mise figure heretofore stated. There was a memo in the file initialed by D. C. Kelleher, another city counselor.

Assistant City Counselor Henry H. Fox, Jr., who was an assistant to Delinquent Land Tax Attorney Thice in the office of the Collector of Revenue, testified that in December or January, 1946-7, Land Commissioner Miller had a conversation with him in that office, at which Thice was present along with Mr. Coyne Law, an Assistant Land Tax Attorney. Fox said that in the conversation Mr. Miller, speaking as Land Commissioner under the Land Tax Collection Law, "indicated it was his opinion that the Land Trust had no interest in this property until such time as the Court had actually confirmed the sale." And he quoted Miller as further saying "that as far as his office was concerned, in the future, it was not necessary to serve any of these notices upon his office, which we had been insisting upon in the past." This, Fox said, was before the circuit court approved the compromise tax settlement with the county court in this case on January 24, 1947. And he didn't know the Land Trust was represented at that time by another attorney, Mr. Adams. But Fox conceded he was not representing the Land Trust in whatever he did.

Miss Diviney testified that up to January 18, 1947 her office (Collector of Revenue) had endeavored to serve on the Land Trustees copies of all court orders affecting delinquent lands but between January 18 and January 24, Mr. Miller, Land Commissioner, informed her he was not interested in them. In rebuttal Mr. Miller, Land Commissioner, emphatically denied that he ever told anybody not to serve notices on the Land Trust of these redemption proceedings, and that he thought the Land Trust had no interest in such properties until the foreclosure sale had been confirmed by the circuit court.

On May 21, 1948 the trial court called up and overruled the Land Trust's motion of July 3, 1947 to set aside the court's order of January 24, 1947 vacating the foreclosure sale of the lot in controversy to the Land Trust on October 15, 1946. In connection with that ruling the court issued a memorandum opinion holding that the County Collector had control of delinquent land tax foreclosure suits under the Land Tax Collection Law prior to the disaffirmance or affirmance of the sale of a tract to the Land Trust; that the interest of the latter was not such as a private purchaser at the sale would have; that it had no vested interest prior to the approval of the sale by the court and the execution of a deed, and it was not entitled to notice; that the attorney for the County Collector also represented all the interested parties; and that the Land Trust was not entitled to the relief asked in its motion.

Eight days thereafter the court set aside this order of May 21 on learning that M. J. Sullivan, the real purchaser of the lot from the Oxleys had died on May 5, before the order was made. This was ex-

pressed to be done for the purpose of affording the litigants an opportunity to suggest Sullivan's death and to bring in his heirs, devisees and executor. But apparently no such move was made by anyone.

Over a year later, on July 1, 1949, the straw party, M. T. Williams, and the heirs and executor of the deceased M. J. Sullivan, real purchaser of the lot in controversy, filed a lengthy motion reciting the history of the litigation; that no party thereto had revived the cause within one year since his death; and praying that the court dismiss or overrule the motion of the Land Trust of July 3, 1947 seeking a dismissal of the court's original order of January 24, 1947, which latter vacated the foreclosure sale of the lot to the Land Trust on October 15, 1946.

In ruling on this motion of July 1, 1949 the trial court wrote another memorandum opinion dated September 16, 1949, which differed in theory from its prior opinion of May 21, 1948, supra. That opinion held the County Collector had exclusive control of suits under the Land Tax Collection Law; and that the Land Trust had no vested interest in land sold to it thereunder unless and until the sale was approved by the court. But the opinion of September 16 ruled the Land Tax Collection Law prescribes the time and manner in which property may be redeemed thereunder, and is controlling but not *exclusive*—this latter on the theory that the judgment foreclosing a delinquent tax lien is *interlocutory*, and the taxing authorities may *withdraw* land from the suit and *then* compromise the tax claim. This part of the opinion was as follows:

"It is my conviction that the attorneys for the Land Trust and the School District are correct in their view that the Land Tax Collection Act prescribes the time and manner in which the owner of property may redeem *in proceedings under the Land Tax Act*. However, the question is raised as to whether or not the Land Tax Act is exclusive. In other words, can the County Collector through the County Court withdraw a parcel of land from the Land Tax suit and proceed to adjust and settle the tax under Section 11122, R. S. Mo. 1939? If the taxing authorities have the power or authority to withdraw the tract here in question from the Land Tax suit, they then had authority to make an adjustment of the taxes. * * * I have concluded that the judgment foreclosing the tax lien was interlocutory; that the taxing authorities had a right to withdraw the specific piece of property from the Land Tax suit and when this was done the taxing authorities had the right to settle or adjust the tax if the facts brought it within the statute conferring that authority."

Sec. 11122, R. S. 1939 referred to in the court's opinion, now Sec. 140.120 R. S. 1949, appears in the chapter of our statutes dealing with the collection of delinquent taxes generally, and is not a part of the Land Tax Collection Law. It authorizes the county court,

city clerk or other proper officer to compromise back taxes on delinquent land with the owner thereof. But these statutes refer to settlements made before suit for the taxes has been brought, and obviously before judgment and execution therefor. And Sec. 9952A-15, Laws Mo. 1939, p. 884, Mo. R. S. A. Sec. 11197, now Sec. 141.840, R. S. 1949, permits the compromise of back taxes even after the suit has been brought and judgment rendered, but only *up to* the time when the land has been sold under execution. This statute also is, not a part of the Land Tax Collection Law. It applies only to the City of St. Louis and not to Kansas City and Jackson County, since Jackson County does not have more than 700,000 inhabitants. Sec's 9951A-1, 2, Laws Mo. 1939, p. 879; Sec. 141.820.

It is conceded that the Land Tax Collection Law, Laws Mo. 1943, p. 1029 et seq., Sec's 141.210-141.810, R. S. 1949 governs this case. And the admitted facts are that the last known owner of the lot in suit, C. M. Oxley, though duly served with process by publication and mail, never appeared, pleaded or took any steps to defend this tax suit in which she was impleaded, or to redeem her tax delinquent lot over a period of more than a year after a default judgment of foreclosure had been rendered against her on January 12, 1946. Following this she was allowed a waiting period of six months under Sec. 141.520(1) before the sheriff's sale of the lot was advertised. Under Sec. 141.420(1, 2)· she was entitled to redeem the lot by paying the amount due at any time prior to the time of the foreclosure sale by the sheriff; but if she failed to do so she was forever barred and foreclosed of all her right, title and interest in the lot. The statute expressly so provided, and she was so advised by publication under Sec. 141.430, and by mail under Sec's 141.440 and 141.450.

The lot was offered at public sale on three different days but no bid was received equaling the full amount of the delinquent taxes included in the judgment of foreclosure, plus interest, penalties, attorney's fees and costs then due thereon. Thereupon on the third day, October 15, 1946, under Sec. 141.560 the Land Trustees were by operation of law deemed and declared the accepted bidder for said full amount, and the sheriff so reported in his report of the sale, but scratched out that part after the circuit court vacated the sale on January 24, 1947. Under Sec. 141.570 the title to the lot vested in the Land Trust was to be held in trust primarily for the benefit of the taxing authorities.

Under Sec. 141.580(1) the trial court on its own motion or that of any interested party was required to set the cause down for hearing as to confirmation of the foreclosure sale of the lot. And at that hearing the court would take evidence on the value of the lot, offered on behalf of any interested party, with a view to determining whether an adequate consideration had been bid therefor. Under Sec. 141.580-(2) if the court found the bid was adequate it would confirm the sale

and order the sheriff to make a deed of the lot to the purchaser. But if the court found the consideration was inadequate and the purchaser declined to increase his bid and make an additional payment in an amount which the court deemed adequate, then the court would disapprove the sale and order the lot readvertised and resold.

As a matter of fact the record here shows the court did do that very thing on May 8, 1947, continuing the lien of the original foreclosure judgment of January 12, 1946, and ordering the lot readvertised and resold—along with other tracts. There is no explanation of this in the Sullivan briefs. We cannot see why the court made that order of May 8, 1947 ordering the lot readvertised and sold under the judgment of January 12, 1946, when several months earlier on January 24, 1947 it had vacated and set aside altogether the January, 1946 judgment.

Evidently the trial court was confused, as indicated by its divergent memorandum opinions of May 21, 1948 and September 16, 1949. Its final conclusion was that its judgment of foreclosure of January 12, 1946 was interlocutory and could be set aside in its discretion. But the Land Tax Collection Law did not so provide. It dealt with emergent situations. It could be invoked only where the land taxes due had been delinquent for four years, at least in part. It created the Land Trust as a public corporation, Sec. 141.700, to bid upon and purchase foreclosed lands in behalf of the taxing units served by it, for the full amount due and in default of private purchasers so bidding. It provided ample notice by publication and mail to the last record owner, and afforded a waiting period of six months before advertisement of the foreclosure sale. But having furnished all these safeguards it further provided in Sec's 141.420 and 141.530, that in event of the failure of the landowner to redeem the land *prior* to the time of the foreclosure sale his rights, title and interest should be forever barred.

In view of these statutes we are unable to agree with the first contention of the ▮▮▮ appellant Sullivan heirs that the trial court could, *after* the foreclosure judgment on January 12, 1946, sanction a compromise arrangement between the county court and outside parties whereby over $23,000 in delinquent taxes on the lot in controversy were settled for about one-third that amount. It was pointed out in Collector of Revenue v. Parcels of Land, 357 Mo. 1231, 1234(2), 212 SW. (2d) 746, 747(1, 2), that if redemption is not made *prior* to that sale, the owner is barred of any further title or interest in the land. And if that be true where the owner is seeking to *redeem* and pay the *full* amount due, then certainly it should be all the more true where, as here, the owner's transferee seeks to "compromise" and pay *less* than the full amount due.

The next point made by the appellant Sullivan heirs and executor is that the instant suit brought by the Collector of Revenue

under the Land Tax Collection Law was and is a personal action brought severally against the last known owners of the various parcels of land included in the suit. And hence it is contended that upon the death of Sullivan the cause should have-been revived within one year in the name of his heirs, devisees and executor under the Civil Code. Sec. 507.100(3), R. S. 1949. We do not agree. The action was not personal but in rem and no reviver was necessary. Sec. 141.360 of the Law expressly directs that such suits "shall not name any person as defendant." And Sec. 141.400 provides it "shall constitute an action in rem." And neither does the fact that Sec. 141.480(4) provides the foreclosure suit "shall be in equity", deprive it of its character as an action in rem. A proceeding in equity may be an action in rem. These questions were discussed at some length and similarly determined in Spitcaufsky v. Hatten, 353 Mo. 94, 110(1), 182 SW. (2d) 86, 95(2-5), 160 A. L. R. 990. The foregoing disposes of the points chiefly urged by the appellant-respondent Sullivan heirs in their briefs.

■ There remain three points which call for brief discussion. First, it is contended in behalf of the Sullivans that the evidence shows the Land Trust was agreeable to the vacation on January 24, 1947 of the judgment of forfeiture against the last known defendant Oxley, rendered January 12, 1946. We wholly disagree with this contention. There was testimony that Land Commissioner Miller waived notice of tax compromises, but he vigorously denied it. And in any event the three trustees under the Land Trust were the ones who held the title to the lot, and there is no contention that they waived notice or agreed. On the contrary the evidence is that they considered the lot worth $12,500 to $15,000.

■ The second point made is that the Land Trust is estopped to claim title to the lot, this on the theory that when the compromise settlement was accepted by the collector and the county court, the taxing entities entitled to the money, state, county, city and school districts, each accepted its share, although it was only one-third of the amount of taxes due. On this point cases are cited holding that governmental agencies such as cities and counties will in rare instances be held estopped by conduct.[1] But the doctrine cannot be applied to a case such as this where the Land Tax Collection Law has created a Land Trust to bid in delinquent land for the *whole* amount of the tax charges due if it fails to bring that amount at the foreclosure sale. In that situation, under Sec. 141.420 there is no such thing as an authorized compromise *reduction* of the tax delin-

---

[1]State ex inf. McKittrick, Atty. Gen. v. Mo. Utilities Co., 339 Mo. 385, 404(10), 96 SW. (2d) 607, 616(14); State ex inf. Shartel, Atty. Gen. v. Mo. Utilities Co., 331 Mo. 337, 352(7), 53 SW. (2d) 394, 400(11); City of St. Joseph v. St. J. Term. Rd. Co., 268 Mo. 47, 55(1), 186 SW. 1080, 1082(2), 171 A. L. R. 87, 105, Note.

quencies after foreclosure sale to the Land Trust. It is true that under Sec. 141.750 the Land Trust thereafter may *sell* and convey the foreclosed land for less than its *appraised value* on certain conditions, but that is·an entirely different thing.

██ ██ The third point made by counsel for the appellant Sullivan heirs is that the provisions of the Land Tax Collection Law directly involved here, Sec's 48.020 and 48.030, are local and special, and discriminatory against Jackson County (as hereinafter explained), in violation of Art. III, Sec. 40(21) and Art. VI, Sec. 8, Const. Mo. 1945. The first of these constitutional provisions forbids the enactment of any local or special law regulating the affairs of counties, cities or school districts. The second requires the organization of counties under general laws into not more than four classes, so that all counties in the same class shall be governed by the same laws, possess the same powers and be subject to the same restrictions.

The first of the foregoing two statutes, Sec. 48.020, enacted by Laws Mo. 1945, p. 1801, effective December 5, 1945, places in Class 1 all counties having an assessed valuation of $300,000,000 or more. The other statute, Sec. 48.030, in the same Act, provides that the initial classification of the respective counties shall be based on their several assessed valuations as shown in the Journal of the State Board of Equalization, pages 333-400, for the year ending December 31, 1944. The assessed valuation in Jackson County as shown in that Journal, pp. 360-1, was $646,496,280.00. Of that fact we take judicial notice. 31 C. J. S., § 54, p. 632, § 42, p. 606. ·This was more than double the amount required to place the county in Class 1.

Counsel for the appellant Sullivan heirs next invoke Sec's 2(f) and 3, Laws Mo. 1945, pp. 1927-8,ᵃ which went into effect *on* July 1, 1946. This Act in Sec. 3 revamped the 1943 Land Tax Collection Act in certain respects, particularly by making it apply to Class One counties on an assessed valuation basis instead of a population basis, thereby conforming to the new Constitution. And the Section further made the Act applicable to counties of Class One which are *now* operating under the provisions of the Land Tax Collection Act, or which may hereafter *elect* to operate thereunder by adoption of a resolution or order of the county court. In counties so electing the same elective privilege was extended to municipalities therein, and on specified conditions those counties and municipalities could *rescind* their previous elections and revert to their original status outside the Land Tax Collection Act.

But by the terms of the Act, the foregoing elective privilege of rescission did not apply to any Class One county which had never

---

ᵃThese sections of the 1945 law are the same as the corresponding sections in Laws Mo. 1949, pp. 603-4, and Sec's 141.220(2) and 141.230(1), R. S. 1949, except the last two provisos of both of the latter.

*elected* to come under the Land Tax Collection Act. And at the times here involved Jackson County had never made such an election. It was the only county in the State covered by the 1943 Land Tax Collection Act on the population basis then provided for, and that Act did not grant an elective privilege. This discrimination was not rectified until July 29, 1949 by Laws Mo. 1949, pp. 602, 604; Sec. 141.230(2) R. S. 1949, which added to Section 3 thereof another proviso that any county which "may have *operated*" under the Land Tax Collection Act "prior to the enactment of this section," may hereafter *elect* to terminate any further operation under the Act by the same procedure as if it had originally elected to operate thereunder.

The contention of counsel for the appellant Sullivan heirs that the Land Tax Collection Act, supra, Laws Mo. 1945, Sec. 3, l. c. 1928, effective July 1, 1946, was local, special and discriminatory against Jackson County in violation of Art. III, Sec. 40(21), and Art. VI, Sec. 8 Const. Mo. 1945, supra, is based on the fact just pointed out in the last paragraph that it "fixed the law absolutely upon Jackson County," but left it to the county courts and cities in other counties to adopt or reject the law as they saw fit.

But in our opinion the proceedings in the Collector of Revenue's foreclosure suit were saved from claimed unconstitutionality by the Schedule of the new Constitution. Section 2 thereof provided: "All laws inconsistent with this Constitution, unless sooner repealed or amended to conform with this Constitution, shall remain in full force and effect *until* July 1, 1946." And Sec. 5 of the Schedule provided "all fines, taxes, penalties and forfeitures assessed, levied, due or owing prior to the adoption of this Constitution (on February 27, 1945) shall continue to be as valid as if this Constitution had not been adopted."

The delinquent taxes sued on here accrued between 1927 and 1944. The tax suit was brought on August 29, 1945. The judgment of foreclosure against C. M. Oxley the then record owner, was rendered on January 12, 1946, nearly six months before July 1, 1946 when the new Constitution wiped out prior inconsistent laws. That judgment barred and forever foreclosed all her right, title and interest in the land. Laws Mo. 1943, Sec. 16, p. 1038, Sec. 141.420(1, 2), R. S. 1949; Laws Mo. 1943, Sec. 25, p. 1046, Sec. 141.530, R. S. 1949.

For the reasons stated the judgment of the trial court vacating the judgment of foreclosure and the foreclosure sale to the Land Trust is reversed and the cause remanded with directions to enter a judgment affirming the same. All concur.

*Hyde, J.*, also concurs in separate opinion in which *Hollingsworth, Dalton, Leedy* and *Conkling, JJ.*, concur and *Ellison, C. J.*, concurs.

HYDE, J., (concurring.)—I concur in the opinion of Ellison, C. J., herein. However, I think something more should be said about the constitutionality of the Land Tax Collection Act because the ground upon which it is upheld as to this particular case leaves doubt as to its validity after July 1, 1946. My view is that this Act is in no way affected by Sec. 8, Art. VI of the 1945 Constitution or by Sec. 40(21) of Art. III thereof. I think we ruled on substantially the same situation in Inter-City Fire Protection District of Jackson County v. Gambrell, 360 Mo. 924, 231 S. W. (2d) 193, and that this case is governed by the principles therein stated and the authorities therein cited.

We held in that case that the questioned Fire District Act did not deal with "the organization and powers" of counties. Instead we said: "It deals with a different type of political sub-division, to-wit, a type of municipal corporation duly organized and existing under a general law providing for its incorporation by decree of the circuit court." We held "that the statute, House Bill 7, is not unconstitutional as 'an attempt to create an additional class of counties in violation of Art. VI, Sec. 8 of the Constitution of 1945', nor is it a statute 'regulating the affairs of counties' within the meaning of paragraph 21 of Sec. 40, Art. III of the Constitution of 1945.'" We have also held that a sewer district, even if wholly within a city, did not violate the similar provision of the Constitution of 1875 (Sec. 7, Art. 9) concerning the organization and classification of cities. (State ex inf. Gentry v. Curtis, 319 Mo. 316, 4 S. W. (2d) 467.)

I think the same thing is true of the Land Tax Collection Act. It does not deal with "the organization and powers" of counties and the Land Trust created by the Act is no part of county government. The Land Trust is a separate entity from the county; it is a public or political corporation. (Spitcaufsky v. Hatten, 353 Mo. 94, 182 S. W. (2d) 86, l. c. 108.) The functions of the Land Trust go beyond county government. Its services are rendered not merely to the county but also to the State of Missouri and to every municipality, school district, road district, sewer district, levee district, drainage district and other tax districts located in the county in which it operates. It has its own official seal; "the power to sue and issue deeds in its name"; "the general power to administer its business as any other corporate body"; and it may convey real estate "without ▇ in any case procuring any consent, conveyance or other instrument from the beneficiaries for which it acts." (1943 Act, Sec. 40, Laws 1943, p. 1056, now Sec. 141.750, R. S. 1949 V.A.M.S.) Thus it is completely independent of the county which may, through its county court, appoint only one of the three managing trustees. As a public corporation, it is really an agency of the State of Missouri in its governmental

powers of collection of taxes, created for the purpose of orderly administration of tax delinquent lands to get reasonable returns for revenue, from taxation on all tax delinquent lands, to the State, its political sub-divisions, the municipalities and special tax districts created by the State in the county in which it operates. I do not think this is changed by the elective features applicable to Class One counties added by the Amendments of 1945 and 1949 (Laws 1945, p. 1926; Laws 1949, p. 602) because the organization, purposes and functions of the Land Trust remain the same. Therefore, it is my conclusion that the Land Tax Collection Act is not in conflict with either of the constitutional provisions relied upon herein and is a valid Act under the 1945 Constitution.

*Hollingsworth, Dalton, Leedy, Conkling, JJ.,* and *Ellison, C.J.,* concur.